# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YELLOWCAKE, INC., | CASE NO. 1:20-CV-0787 AWI BAM |
| **Plaintiff** | |
| v. | **ORDER ON COUNT-DEFENDANTS' MOTION TO DISMISS** |
| MORENA MUSIC, INC., and EDUARDO LEON dba Long Play Music, and DOES 1-50 inclusive, | (Doc. No. 19) |
| **Defendants** | |
| _____ | |
| MORENA MUSIC, INC, | |
| **Count-Plaintiff** | |
| v. | |
| YELLOWCAKE, INC., COLONIZE MEDIA, INC., and JOSE DAVID HERNANDEZ, | |
| **Counter-Defendants** | |

This is a copyright dispute involving three musical albums by the artist Los Originales De San Juan.  Counter-Plaintiff Morena Music, Inc. ("Morena") brings claims against Counter-Defendants Yellowcake, Inc. ("Yellowcake"), Colonize Media, Inc. ("Colonize"), and Jose Hernandez ("Hernandez") (collectively "YCH") for two copyright violations under the Copyright Act (17 U.S.C. § 100 et seq.) involving the albums and cover art, and state law claims for intentional interference with prospective economic advantage, intentional interference with contractual relations, unfair competition, and conversion.  Currently before the Court is YCH's Rule 12(b)(6) motion to dismiss six of the seven claims alleged against them.  For the reasons that follow, YCH's motion will generally be granted.

1              **RULE 12(b)(6) FRAMEWORK**

2          Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the

3    plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

4    Counterclaims are subject to Rule 12(b)(6) challenges.  See Seismic Reservoir 2020, Inc. v.

5    Paulsson, 785 F.3d 330, 335 (9th Cir. 2015).  A dismissal under Rule 12(b)(6) may be based on

6    the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a

7    cognizable legal theory.  Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015).  In

8    reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken

9    as true and construed in the light most favorable to the non-moving party.  Kwan v. SanMedica,

10   Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017).  However, complaints that offer no more than "labels

11   and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

12   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793

13   F.3d 1005, 1008 (9th Cir. 2015).  The Court is "not required to accept as true allegations that

14   contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or

15   allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

16   inferences."  Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254

17   (9th Cir. 2013).  To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual

18   matter, accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at

19   678; Mollett, 795 F.3d at 1065.  "A claim has facial plausibility when the plaintiff pleads factual

20   content that allows the court to draw the reasonable inference that the defendant is liable for the

21   misconduct alleged."  Iqbal, 556 U.S. at 678; Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir.

22   2013).  "Plausibility" means "more than a sheer possibility," but less than a probability, and facts

23   that are "merely consistent" with liability fall short of "plausibility."  Iqbal, 556 U.S. at 678;

24   Somers, 729 F.3d at 960.  The Ninth Circuit has distilled the following principles for Rule

25   12(b)(6) motions: (1) to be entitled to the presumption of truth, allegations in a complaint or

26   counterclaim may not simply recite the elements of a cause of action, but must contain sufficient

27   allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

28   effectively; (2) the factual allegations that are taken as true must plausibly suggest entitlement to

                                                    2

1  relief, such that it is not unfair to require the opposing party to be subjected to the expense of
2  discovery and continued litigation.  Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014).  If a
3  motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to
4  amend the pleading was made . . . ."  Ebner v. Fresh, Inc., 838 F.3d 958, 962 (9th Cir. 2016).
5  However, leave to amend need not be granted if amendment would be futile or the plaintiff has
6  failed to cure deficiencies despite repeated opportunities.  Garmon v. County of L.A., 828 F.3d
7  837, 842 (9th Cir. 2016).

8

9  **BACKGROUND**

10      Morena is a record label that is in the business of producing, manufacturing, distributing,
11  exploiting, selling, and licensing sound and audiovisual recordings and artwork.  Jesus Chavez Sr.
12  ("Chavez") is the founder and principal of the musical group Los Originales De San Juan, a
13  popular Mexican musical group.

14      On September 16, 2013, Morena entered into an oral recording agreement with Chavez
15  whereby Morena commissioned Chavez to provide services as a recording artist in the making of
16  sound and audio-visual recordings for three albums (50 Mentadas, 15 Corridos Inmortales, and
17  Celebrando 39).  Pursuant to the agreement, Morena agreed to:  (1) select the musical
18  compositions to be recorded on the albums; (2) produce the musical performances on the albums;
19  (3) direct the recording and filming of musical and audiovisual performances to be embodied on
20  the albums; and (4) pay Chavez a fixed amount per album.  Chavez agreed to follow Morena's
21  artistic direction, perform the recordings, and grant Morena the non-exclusive right to utilize
22  Chavez's likeness and his group's name.  Chavez also agreed that Morena would be the owner of
23  all title, right, and interest in and to the tangible masters of the albums and all intellectual property
24  rights in the musical performances embodied in the tangible masters of the albums (including the
25  copyrights and any extensions and renewals of the copyrights) from the inception of the creation
26  of each album.  Morena performed the above services and contributed sufficient originality to the
27  albums such that Morena at a minimum is a co-author, co-owner, or joint owner of the copyrights
28  in the albums for purposes of the Copyright Act.  Morena also produced, created, and designed the

album cover art for each of the three albums.  Morena also registered copyrights in the content of the three albums and in the cover art of the three albums.  Morena alleges that it is the exclusive copyright owner of the three albums and the albums' cover art.

In April 2019, Hernandez had a meeting with Chavez wherein Hernandez expressed his interest in exploiting the three Los Originales' albums.  Chavez advised Hernandez that he had entered into a contract with Morena and that Morena was owner of the three albums.  Hernandez intentionally misled Chavez and wrongfully told Chavez that Morena had no rights in the three albums and that Chavez was free to sell to Hernandez's companies, Colonize and Yellowcake.  Hernandez offered Chavez a significant sum of money purportedly to purchase the rights to the three albums and also promised to indemnify Chavez if Morena sought legal redress from Chavez.  Hernandez engaged in this conduct individually and on behalf of Colonize and Yellowcake to disrupt the contractual relations between Morena and Chavez.  Chavez purportedly entered into an agreement with Yellowcake.  In exchange for money, Chavez wrongfully transferred his ownership rights in the three albums and cover art to Yellowcake, even though Chavez had no such rights to grant.

On December 21, 2019, Morena discovered that Yellowcake and Colonize created or caused the creation of copies of the three Los Originales albums and cover art and was distributing, selling and exploiting these works through online platforms such as ITunes, Amazon Music, and YouTube.  The only difference between the cover art created by Morena and the cover art being utilized by Yellowcake and Colonize was that Yellowcake and Colonize removed the Morena logos and replaced them with Yellowcake and Colonize's respective logos.  This was done without Morena's authorization.  Yellowcake sent correspondences to Morena in which Yellowcake was claiming ownership of the masters and sound recordings of the three albums.

Yellowcake and Colonize sent fraudulent takedown notices to YouTube that falsely claimed that Morena had no right to post or upload the three albums and cover art.  Prior to the takedown notices, Morena had received significant revenue from YouTube, and the YouTube uploads provided an important and lucrative marketing channel for the three albums and cover art.  Now, YCH's uploads of the albums and cover art have generated substantial views and revenue on

their YouTube channels.  YCH's exploitation of the three albums is unlawful and a blatant violation of California law and federal copyright law.

On June 4, 2020, Yellowcake filed a copyright infringement claim against Morena.  On June 10, 2020, Morena procured registered copyrights for the three albums.  See Berman Reply Dec. Exs. A, B, C.[1]  On September 1, 2020, Morena filed its counterclaim.

## COUNTER-DEFENDANTS' MOTION TO DISMISS

**I.     First Cause of Action – Copyright Infringement of Sound Recordings**

*Counter-Defendants' Arguments*

Yellowcake explains that in March 2019, it entered into an asset purchase agreement with Chavez whereby Yellowcake purchased the entirety of Chavez's ownership in the rights, title, and interest in the sound recordings that comprise the albums of Los Originales De San Juan. Yellowcake then complied in all respects with the provisions of the Copyright Act by registering copyrights for each of the sound recordings.  Yellowcake was issued a Certificate of Registration for each copyrighted sound recording.

Yellowcake argues that the first copyright claim fails because Morena cannot establish that it has valid ownership of a copyright in the albums.  Morena purports to make its ownership claim by alleging an oral agreement with Chavez, whose performance created the entirety of the content of the albums.  As the author of the musical performances, Chavez has an ownership interest in the albums.  However, ownership of copyrights cannot be transferred by oral agreement.  In the absence of a writing between Morena and Chavez, Chavez had the ability to transfer his ownership of the sound recordings to Yellowcake.  At best, the oral agreement created a non-exclusive license, but non-exclusive licenses are excluded from the definition of what constitutes a transfer of copyright interest.

---

[1] Exhibits A, B, and C of the Berman Reply Declaration are copies of registration information from the U.S. Copyright Office's Online Catalog regarding the three albums.  The Court takes judicial notice of these governmental records.  See Fed. R. Evid. 201; Basile v. Twneitieth Century Fox Film Corp., 678 F. App'x 576, 577 (9th Cir. 2017); Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1146 (9th Cir. 2008); Kaseberg v. Conaco, LLC, 360 F.Supp.3d 1026, 1029 n.2 (S.D. Cal. 2018); Obodai v. YouTube LLC, 840 F.Supp.2d 714, 715 n.1 (S.D. N.Y. 2011).

1    *Counter-Plaintiff's Opposition*

2          Morena argues that, pursuant to ¶ 16, the Counterclaim alleges that Morena is a co-author

3    of the three albums with Chavez.  As a co-author, Morena has an equal undivided interest in the

4    whole of the works with Chavez.  This is the case regardless of whether the Counterclaim in the

5    alternative pleads that Morena was granted an oral license from Chavez.  Therefore, YCH's

6    arguments that it does not possess a valid copyright in the sound recordings and masters, or that

7    any claim thereto is made only by way of an oral argument with Chavez, is misplaced.  As a co-

8    author, Morena may sue YCH for copyright infringement because Chavez never had the ability to

9    grant the exclusive rights that YCH believed it had obtained.

10   *Legal Standard*

11         "The Copyright Act affords copyright owners the 'exclusive rights' to display, perform,

12   reproduce, or distribute copies of a copyrighted work, to authorize others to do those things, and to

13   prepare derivative works based upon the copyrighted work."  Maloney v. T3Media, Inc., 853 F.3d

14   1004, 1010 (9th Cir. 2017); see 17 U.S.C. § 106.  Only the "legal or beneficial owner of an

15   exclusive right under a copyright" has standing to sue for infringement of that right.  Righthaven

16   LLC v. Hoehn, 716 F.3d 1166, 1169 (9th Cir. 2013).  Further, while one can own a copyright and

17   have property rights in a work without a registration, the owner needs to register the copyright

18   before he can sue for infringement.  See 17 U.S.C. §§ 408(a), 411(a); Gold Value Int'l Textile, Inc.

19   v. Sanctuary Clothing, Ltd. Liab. Co., 925 F.3d 1140, 1144 (9th Cir. 2019); Alaska Stock, LLC v.

20   Houghton Mifflin Harcourt Publ'g Co., 747 F.3d 673, 678 (9th Cir. 2014).  A claim for copyright

21   infringement has two basic elements:  (1) ownership of a valid copyright, and (2) copying of

22   constituent elements of the work that are original.  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499

23   U.S. 340, 351 (1991); Great Minds v. Office Depot, Inc., 945 F.3d 1106, 1110 (9th Cir. 2019);

24   Seven Arts, 733 F.3d at 1254.  "To plead ownership, [a plaintiff] must plausibly allege it owns a

25   valid copyright registration for its works."  Malibu Textiles, Inc. v. Label Lane Int'l, Inc., 922

26   F.3d 946, 951 (9th Cir. 2019).

27   *Discussion*

28         Morena's opposition focuses on allegations in Paragraph 16 to contend that it is a co-

author and therefore a joint owner of the three albums.  This is a reasonable reading of Paragraph

16.  However, the Counterclaim also alleges an agreement between Morena and Chavez for the

intellectual property rights in the three albums.  Further, documents from the Copyright Office

indicate that Morena named itself as the author of the albums as an "employer" in a work for hire

arrangement.  Therefore, the opposition, the Counterclaim, and the judicially noticed documents

indicate three potential theories of ownership by Morena in the three albums.  The Court will

examine each theory separately.

   1. Transfer from Chavez to Morena

  "Copyright owners may transfer '[a]ny exclusive rights comprised in a copyright,

including any subdivision of any of the rights specified in [17 U.S.C. § 106],' . . . so long as the

transfer is evidenced by a signed writing."  Corbello v. Devito, 777 F.3d 1058, 1062 (9t h Cir.

2015) (citing 17 U.S.C. §§ 201(d)(2) and 204(a)); see also Jules Jordan Video, Inv. v. 144942

Canada, Inc., 617 F.3d 1146, 1156 (9th Cir. 2010).  Specifically, the Copyright Act provides that a

"transfer of copyright ownership, other than by operation of law, is not valid unless an instrument

of conveyance, or a note or memorandum of transfer, is in writing and signed by the owner of the

rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  "[S]ection 204 of

the Copyright Act invalidates a purported transfer of ownership unless it is in writing."  Effects

Assocs. v. Cohen, 908 F.2d 555, 556 (9th Cir. 1990); see Radio TV Espanola S.A. v. New World

Entm't Ltd., 183 F.3d 922, 926-27 (9th Cir. 1999); Konigsberg Int'l, Inc. v. Rice, 16 F.3d 355,

356-57 (9th Cir. 1994).

   a. Ability to Raise Compliance with § 204(a)

  The general rule in the Ninth Circuit is that a third party may not raise noncompliance with

17 U.S.C. § 204(a)'s writing requirement as a defense to a copyright transfer.  DRK Photo, 870

F.3d at 986.  Section 204(a) is "designed to resolve disputes between owners and transferees and

to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or

copyright ownership."  Jules Jordan Video, 617 F.3d at 1157; see Billy-Bob Teeth, Inc. v.

Novelty, Inc., 329 F.3d 586, 592 (7th Cir. 2003).  In the absence of a dispute between the

copyright owner and transferee, "it would be unusual and unwarranted to permit a third-party

1    infringer to invoke § 204(a) to avoid suit for copyright infringement." <u>Jules Jordan Video</u>, 617

2    F.3d at 1157 (quoting <u>Billy-Bob Teeth</u>, 329 F.3d at 592).  "Although a third party may not raise

3    noncompliance with [§ 204(a)]'s writing requirement as a defense to a copyright transfer where

4    the parties to the transfer do not dispute it existence, a third party is not foreclosed from

5    challenging a plaintiff's ownership for purposes of standing." <u>DRK Photo v. McGraw-Hill Global</u>

6    <u>Educ. Holdings, LLC</u>, 870 F.3d 978, 986 (9th Cir. 2017) (citing <u>Jules Jordan Video</u>, 617 F.3d at

7    1157 and <u>Righthaven</u>, 716 F.3d at 1169).  The copyright plaintiff bears the burden of establishing

8    a qualifying ownership interest in the copyright both as a substantive element of the infringement

9    claim and also as a necessary predicate for standing to bring the claim.  <u>DRK Photo</u>, 870 F.3d at

10   986.  The absence of standing to bring a copyright infringement claim is a jurisdictional failure.

11   <u>Righthaven</u>, 716 F.3d at 1172-73.

12          Here, no party has raised YCH's ability to raise § 204(a) with respect to the oral agreement

13   between Chavez and Morena.  Despite this failure, the Court finds that YCH's invocation of

14   § 204(a) is  appropriate.  First, as *DRK Photo* expressly makes clear, YCH may invoke § 204(a) as

15   a challenge to standing.  Second, the express allegations in the Counterclaim make clear that the

16   only agreement between Morena and Chavez is an oral one.  Thus, the express allegations by

17   Morena plainly and clearly demonstrate a failure to meet § 204(a)'s requirements.  Third, the

18   Court does not find that the general rule against third parties raising § 204(a) applies in this

19   situation.  This is not a case in which there is no dispute between the copyright holder and the

20   transferee.  This is a case in which Chavez has transferred his rights in the three albums to two

21   separate parties over a span of about six years.  The fact that Chavez has purportedly transferred

22   his rights twice to two different entities does not demonstrate the absence of a conflict between

23   Chavez and Morena, far from it.  Even if there is no animosity between Chavez and Morena, the

24   fact that Chavez entered into a written agreement with YCH indicates that Chavez believed that he

25   had not transferred his ownership interests to Morena.  This is contrary to Morena's alleged

26   position that it held all exclusive rights by virtue of its agreement with Chavez.  Thus, the second

27   transfer by Chavez is indicative of a dispute between Chavez and Morena.  Ultimately, the Court

28   is faced with competing claims from two entities who claim ownership in copyrights through a

1 common transferee who transferred the copyrights twice.  Under these circumstances, the Court

2 finds that it is appropriate for YCH to raise the issue of compliance with § 204(a).

3                 **b.**       <u>Effect of § 204(a)</u>

4        The Counterclaim affirmatively states that Morena and Chavez entered into oral recording

5 agreements that included the transfer to Morena of all intellectual property rights that Chavez had

6 in the three albums.  <u>See</u> Counterclaim ¶ 15.  There are no allegations that Morena and Chavez

7 entered into any kind of written agreement whatsoever.

8        The absence of a written agreement is a key argument made in YCH's motion, yet

9 Morena's opposition does not address the argument in terms of answering the writing requirement.

10 That is, Morena does not argue that it has a written agreement with Chavez or that a written

11 agreement is somehow unnecessary to affect a transfer of Chavez's copyright interests.   Instead,

12 the opposition regarding the first cause of action mentions the agreement with Chavez one time,

13 and only then in an attempt to recharacterize the agreement or the agreement's effect.

14 Specifically, after stating the legal proposition that a co-author shares an equal undivided interest

15 in a copyrighted work, Morena states:  "This is the case regardless of whether Morena Music also

16 pleads in the alternative that it was granted an oral license to such rights."  Doc. No. 22 at 4:12-13.

17        It is noteworthy that the Counterclaim never uses the term "license" or expressly alleges

18 any claim or theory "in the alternative."  Nevertheless, accepting that the Counterclaim is alleging

19 that a license exists, that does not aid Morena.  A non-exclusive license may be granted orally or

20 implied from conduct.  <u>Effects Assocs.</u>, 908 F.2d at 558.  The granting of a non-exclusive license

21 waives the right of the copyright owner to sue the licensee for copyright infringement.  <u>Graham v.</u>

22 <u>Jones</u>, 144 F.3d 229, 236 (2d Cir. 1998).  Critically, a "mere 'non-exclusive license' does not

23 constitute a 'transfer of copyright ownership' and therefore cannot confer standing to assert [a

24 copyright] infringement claim."  <u>DRK Photo</u>, 870 F.3d at 983; <u>see</u> <u>Sybersound Records, Inc. v.</u>

25 <u>UAV Corp.</u>, 517 F.3d 1137, 1146 (9th Cir. 2008).  Therefore, even if the Court accepts Morena's

26 characterization of its agreement with Chavez, the license that would be created is non-exclusive

27 only, the license could only serve as a defense to a claim by Chavez, and it would not form an

28 ownership interest sufficient to confer standing under the first cause of action.  The first cause of

1  action is in no way furthered by the contention that the oral agreement created a license in the

2  albums as between Chavez and Morena.

3        Based on the Counterclaim and the opposition, it is apparent that the only agreement

4  between Chavez and Morena is an oral agreement.  The absence of a written transfer agreement

5  defeats both Morena's standing to pursue, and substantive claim of, copyright infringement based

6  on a transfer of ownership between Chavez and Morena.  See 17 U.S.C. § 204(a); DRK Photo,

7  870 F.3d at 986; Righthaven, 716 F.3d at 1172; Radio TV Espanola, 183 F.3d at 926-27;

8  Konigsberg, 16 F.3d at 356-57; Effects Assocs., 908 F.2d at 556-57.  To the extent a non-

9  exclusive license may be involved or plead in the Counterclaim, that non-exclusive license does

10 not give Morena standing to pursue a copyright infringement claim.  DRK Photo, 870 F.3d at 983.

11 Therefore, the first cause of action does not allege a valid or plausible ownership interest in the

12 copyrights of the three albums based on a contractual transfer between Morena and Chavez.

13        2.      Joint Owner/Co-Author

14        A "joint work" is "a work prepared by two or more authors with the intention that their

15 contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. §

16 101; Aalmuhammed v. Lee, 202 F.3d 1227, 1231 (9th Cir. 2000); Ashton-Tate Corp. v. Ross, 916

17 F.2d 516, 520 (9th Cir. 1990).  "The authors of a joint work are co-owners of the copyright in that

18 work."  17 U.S.C. § 201(a); Richlin v. MGM Pictures, Inc., 531 F.3d 962, 968 (9th Cir. 2008);

19 Ashton-Tate, 916 F.2d at 521.  Each author must make an "independently copyrightable

20 contribution," which is a contribution that "represents original expression that could stand on its

21 own as the subject matter of copyright."  Ashton-Tate, 916 F.2d at 521 (quoting P. Goldstein,

22 Copyright:  Principles, Law and Practice, § 4.2.1 p.379 (1989)); see also Richlin, 531 F.3d at 968.

23 That is, "to be an author, one must supply more than mere direction or ideas; one must 'translate

24 an idea into a fixed tangible expression entitled to copyright protection."  S.O.S., Inc. v. Payday,

25 Inc., 886 F.2d 1081, 1087 (9th Cir. 1989); Ashton-Tate, 916 F.2d at 521.   Therefore, in the Ninth

26 Circuit, a "joint work" has four elements:  (1) a copyrightable work, (2) two or more authors, (3)

27 the authors intend for their contributions to be merged into inseparable or interdependent parts of a

28 unitary whole, and (4) each author made an independently copyrightable contribution to the work.

Aalmuhammed, 202 F.3d at 1231.  In determining whether individuals are co-authors of a joint work, a contract that defines relationship as one of co-authors is dispositive.  See Richlin, 531 F.3d at 968; Aalmuhammed, 202 F.3d at 1234.  In the absence of contract, courts consider whether:  (1) a purported author "superintends" the work by exercising control; (2) the putative co-authors make objective manifestations of a shared intent to be co-authors; and (3) the audience appeal of the work turns on both contributions and the share of each in its success cannot be appraised.  Aalmuhammed, 202 F.3d at 1234; see also Richlin, 531 F.3d at 968.  The first factor, control, will often be the most important consideration.  Richlin, 531 F.3d at 968; Aalmuhammed, 202 F.3d at 1234.  Additionally, because each co-author of a "joint work" has an independent right to use or license the copyright, a co-author cannot be liable to another co-author for infringement of copyright, but co-authors must account to other co-authors for any profits earned from licensing or using the copyright.  See Ashton-Tate, 916 F.2d at 522; Oddo v. Ries, 743 F.3d 630, 632-33 (9th Cir. 1984).  Further, unless all co-authors of a "joint work" join in granting an exclusive license, a single co-author (acting on its own behalf) can grant only a non-exclusive license in the copyright work because one co-author cannot limit the other co-authors' independent right to exploit the copyright.  Sybersound, 517 F.3d at 1146.  However, a co-owner of a copyright is free to transfer his ownership interest to another, as long as the transfer is only of the exclusive copyright interests that the transferring co-owner himself possesses.  Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n, 953 F.3d 638, 645 n.2 (9th Cir. 2020).

Here, YCH does not argue that the relevant allegations in the Counterclaim (Paragraphs 15 and 16) do not plausibly allege that the albums are joint works and that Chavez and Morena are co-authors.  Additionally, recent Ninth Circuit authority indicates some of the requirements for a joint ownership as co-authors can at least be plausibly inferred from the Counterclaim.  In *Abs Entertainment*, the Ninth Circuit addressed the copyright claims of remastering engineers in remastered sound recordings.  See Abs Entm't v. CBS Corp., 908 F.3d 405, 410-11 (9th Cir. 2018).  As relevant here, the Ninth Circuit made a distinction between remastering engineers and recording engineers/record producers:

Nothing in this opinion should be construed to question or limit the creative

contributions of the recording engineers and/or record producers responsible for the recording session that led to the initial fixation of the sound recording. The initial producer/engineer's role is often to work in collaboration with the performing artists to make many of the creative decisions that define the overall sound of the recording as fixed, including such things as microphone choice, microphone placement, setting sound levels, equipment used, processing filters employed, tapes selected, session structure, and other similar decisions analogous to the creative choices of photographers that courts have consistently held to be original. See *United States Copyright Office and Sound Recordings as Works Made for Hire: Hearing Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 106th Cong. 2nd Sess. (2000) (statement of Marybeth Peters, Register of Copyrights) ("The copyrightable elements in a sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording."); cf. Burrow-Giles, 111 U.S. at 60 (holding that photographs are copyrightable to the extent of the photographer's decisions with respect to costume, accessories, pose of subjects, light and shade and evoking the desired expression).

Id. at 423.  Given *Abs Entm't*'s observations regarding the contributions of record producers, and the absence of any substantive arguments against the relevant allegations of the Counterclaim, for purposes of this motion, dismissal based on the absence of an ownership interest is inappropriate.

However, accepting the allegation of co-authorship, and thus joint ownership, of the three albums would appear to defeat Morena's claim of copyright infringement.  Morena's theory means that it was a co-owner of the copyrights in the albums with Chavez.  There is no dispute that Chavez entered into a written transfer agreement with YCH.  See Complaint at Ex. A; Counterclaim ¶¶ 21, 22.  Because it is clear that Morena was not a party to that transfer, Chavez could not transfer exclusive rights to YCH.  See Sybersound, 517 F.3d at 1146.  However, Chavez could transfer his ownership interest in the albums to YCH.  See Tresona Multimedia, 953 F.3d at 645 n.2.  Therefore, the agreement between Chavez and YCH could have transferred Chavez's interests in the album to YCH.  The ultimate result would be that Morena is now a joint owner of the copyrights in the albums with YCH.  One joint owner of a copyright cannot sue another joint owner of a copyright for copyright infringement.  See Ashton-Tate, 916 F.2d at 522; Oddo, 743 F.3d at 632-33.  Given the current state of the briefing before the Court, Morena's theory of co-authorship/joint ownership defeats its claim of copyright infringement because the other joint owner is Yellowcake.  See id.; Complaint at Exs. A, B, C.

1

    3.    Work for Hire

2

A work made for hire is defined as either:

3

(1) a work prepared by an employee within the scope of his or her employment; or

4

5

6

7

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audio visual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the works shall be considered a work made for hire.

17 U.S.C.  101; Hendricks & Lewis PLLC v. Clinton, 766 F.3d 991, 998 n.5 (9th Cir. 2014); Jules

8

Jordan Video, 617 F.3d at 1156.  With respect to the first definition, the terms "employee" and

9

"scope of employment" are construed according to common law agency principles.  Community

10

for Creative Non-Violence v. Reid, 490 U.S. 730, 740-41 (1989); U.S. Auto Parts Network, Inc. v.

11

Parts Geek, Ltd. Liab. Co., 692 F.3d 1009, 1015 (9th Cir. 2012); JustMed, Inc. v. Byce, 600 F.3d

12

1118, 1125 (9th Cir. 2010).  The central question for determining whether a person is an

13

"employee" is "the hiring party's right to control the manner and means by which the product is

14

accomplished."  Reid, 490 U.S. at 751; JustMed, 600 F.3d at 1125.  Factors that a court should

15

consider for determining "employee" status include:  the skill required for that occupation, the

16

source of the instrumentalities and tools, the location of the work, the duration of the relationship

17

between the parties, whether the hiring party has the right to assign additional projects to the hired

18

party, the extent of the hired party's discretion over when and how long to work, the method of

19

payment, the hired party's role in hiring and paying assistants, whether the work is part of the

20

regular business of the hiring party, whether the hiring party is in business, the provision of

21

employee benefits, and the tax treatment of the hired party.  Reid, 490 U.S. at 751-52; JustMed,

22

600 F.3d at 1125.  An employee's "scope of employment" is determined by examining three

23

factors:  (1) the work is of the kind the employee is employed to perform; (2) the work occurs

24

substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a

25

purpose to serve the employer.  U.S. Auto Parts, 692 F.3d at 1015.  With respect to the second

26

definition, "[w]orks 'specially ordered or commissioned' can only be made after the execution of

27

an express agreement between the parties."  Gladwell Gov't Servs., Inc. v. County of Marin, 265

28

1  F. App'x 624, 626 (9th Cir. 2008); <u>Schiller & Schmidt, Inc. v. Nordisco Corp.</u>, 969 F.2d 410, 413

2  (7th Cir. 1992); <u>Sisyphus Touring, Inc. v. TMZ Prods.</u>, 208 F.Supp.3d 11xx, 1111-12 (C.D. Cal.

3  2016).  No specific wording need be used in order for a writing to constitute a "work for hire"

4  agreement."  <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1141 (9th Cir. 2003).

5  However, if there is no written instrument at all, then the work cannot be a commissioned or

6  specially ordered "work for hire."  <u>Jules Jordan Video</u>, 617 F.3d at 1155.  If a work is made for

7  hire, "the employer or other person for whom the work was prepared is considered the author" and

8  owns the copyright "unless the parties have expressly agreed otherwise in a written instrument

9  signed by them."  17 U.S.C. § 201(b); <u>see</u> <u>U.S. Auto Parts</u>, 692 F.3d at 1015.

10      As indicated above, there are only two ways that a work can be deemed a "work for hire."

11  17 U.S.C. § 101.  The Counterclaim's allegations are insufficient to demonstrate either method.

12      First, there are no allegations that a written agreement exists between Chavez and Morena

13  that states that the albums are commissioned works that are to be considered works for hire.  In

14  fact, the Counterclaim alleges that the agreements with Chavez were oral.  <u>See</u> Counterclaim ¶ 15.

15  As a result of this allegation, the albums categorically cannot be specially ordered or

16  commissioned works for hire under § 101(2).  <u>Jules Jordan Video</u>, 617 F.3d at 1155.

17      Second, with respect to "employee" status, Paragraph 15 of the Counterclaim describes the

18  relationship with Chavez.  Some aspects of Paragraph 15 may be supportive of "employee" status

19  under *Reid*, e.g. providing sound engineers and audio/visual directors, while authors do not, e.g.

20  Chavez was paid a fixed rate per album for the agreed three albums.  <u>Cf.</u> Counterclaim ¶ 15 <u>with</u>

21  <u>Reid</u>, 490 U.S. at 751-53.  However, neither Paragraph 15 nor the remainder of the Counterclaim,

22  addresses all of the *Reid* factors.  Further, unlike the express allegation that Morena did enough to

23  be considered a co-author, or the express allegation that Chavez granted Morena all rights in the

24  three albums, there are no express allegations that Chavez was an employee of Morena.  Given

25  who Chavez is (the founder and musical principal of Los Originales De San Juan), and the limited

26  allegations made in the Counterclaim, the Court finds it more plausible that Chavez is an

27  independent contractor, particularly in the absence of an express allegation that Chavez was an

28  employee of Morena.  In the absence of an actual allegation that Chavez was an employee of

Morena, supported by sufficient factual allegations that indicate employee status, there is not a sufficiently plausible indication that Chavez was an employee of Morena who was acting int the cope of his employment for Morena.

        4.    Conclusion

        The Counterclaim does not plausibly allege a valid transfer between Chavez and Morena, nor does the Counterclaim plausibly allege that the three albums were works for hire.  Accepting that there are sufficient plausible allegations that indicate co-authorship between Morena and Chavez, the allegations in the Counterclaim and the Complaint indicate that Chavez transferred at least his ownership interests in the albums to YCH.   As a co-owner, Morena cannot sue YCH for copyright infringement.  Since no plausible infringement claim is stated, dismissal is appropriate.

**II.**      **Third Cause of Action – Injunctive Relief under the Copyright Act**

        The Copyright Act provides that a court "may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 501(a); Flexible Lifeline sys. v. Precision Lift, Inc., 654 F.3d 989, 994 (9th Cir. 2011).  The plain language of § 501(a) presupposes either a plausibly plead or an adequately proven copyright infringement claim.  This is consistent with the nature of an injunctive relief, which is not a standalone cause of action but a remedy that must be supported by a viable substantive cause of action.  TYR Sport Inc. v. Warnaco Swimwear, Inc., 679 F.Supp.2d 1120, 1141 n.13 (C.D. Cal. 2009).  Dismissal of the claim for injunctive relief as a distinct cause of action is appropriate, but Morena is free to request injunctive relief under § 501(a) in the prayer or as part of the allegations under an infringement cause of action.

**III.**      **Fourth, Fifth & Sixth Causes of Action –Intentional Interference with Prospective Business Advantage, Intentional Interference with Contractual Relations, UCL, & Conversion**

*Counter-Defendants' Arguments*

        YCH argues that the state law claims fail because they are preempted by the Copyright Act

1  and fail to satisfy the California statute of frauds requirements.  With respect to preemption, the

2  state law claims are preempted by the Copyright act because they are equivalent to those protected

3  by the Copyright Act and the work falls within the subject matter of the Copyright Act.  Each

4  cause of action depends on a valid transfer of a copyright interest from Chavez to Morena.

5           *Counter-Plaintiff's Opposition*

6           With respect to preemption, Morena argues that the Copyright Act does not preempt any of

7  the state law claims.  Each claim is at least partly based on YCH's wrongdoing affecting Morena's

8  right to own and possess the tangible masters.  Copyright law protects intangible sound recordings

9  but does not protect the material object in which the work is embodied.  The tangible embodiment

10 of intangible rights, like the tangible masters hear, are qualitatively different than what is protected

11 by the Copyright Act.  YCH cite no case in which the Copyright Act preempts a claim based on

12 property rights in tangible embodiments like the masters.  Therefore, there is no preemption.

13          With respect to the statute of frauds, full performance of the contract is an exception to the

14 writing requirement.  Morena argues that it has fully performed under the terms of the oral

15 agreement.  Therefore, the California statute of frauds requirement has been met.  Additionally,

16 YCH's reliance on the 17 U.S.C. § 204(a)'s requirement for a writing is misplaced because that

17 section only involves transfers of a copyright.  That section can have no application to the masters,

18 which are tangible property and not copyrights.  Finally, Morena argues each state law claim

19 incorporates by reference allegations regarding its co-authorship  of the three albums.  Thus,

20 contrary to YCH's arguments, not one counterclaim relies solely on Morena being able to

21 establish ownership of the copyrights herein through a written contract.

22          *Discussion*

23          YCH's arguments against the state law counterclaims are primarily based on either

24 Copyright Act preemption or state law statute of frauds.

25          1.    California Statute of Frauds

26          YCH invokes Cal. Civ. Code § 1624(a)(1), which applies to agreements that by their terms

27 are not to be performed within one year of making the agreement.  See Cal. Civ. Code §

28 1624(a)(1); Zakk v. Diesel, 33 Cal.App.5th 431, 449 (2019).  However, even if a contract cannot

be completely performed within one year of execution, if the contract has been fully performed by one party, the remaining promise is taken out of the statute of frauds and may be enforced by the performing party.  See Dutton v. Interstate Investment Corp., 19 Cal.2d 65, (1941); Dougherty v. California Kettleman Oil Royalties, 9 Cal.2d 58, 81 (1937); Zakk, 33 Cal.App.5th 449-54; Secrest v. Security Nat'l Morg. Loan Trust 2002-2, 167 Cal.App.4th 544, 556 (2008).

Here, the allegations in the Counterclaim generally describe the agreement with Chavez as being one for the completion of the albums in exchange for a fixed monetary amount per album. See Counterclaim ¶¶ 15, 16.  There are no allegations that indicate that Morena has additional contractual promises to perform.  While there are no allegations that address the statute of frauds expressly, that is hardly surprising as the statute of frauds is an affirmative defense.  See Fed. R. Civ. P. 8(c)(1); Corbin v. Time Warner Entm't-Advance/Newhouse P'ship, 821 F.3d 1069, 1079-80 (9th Cir. 2016); Walton v. City of Red Bluff, 2 Cal.App.4th 117, 131 (1991).  Further, YCH does not address in its reply Morena's "full performance" argument.  In the absence of any response from YCH, and because the applicability of the statute of frauds is not apparent from the face of the counterclaim, dismissal of any state law claim based on the potential application of the statue of frauds is inappropriate.  See McCalden v. California Library Ass'n, 955 F.2d 1214, 1219 (9th Cir. 1990) (holding that a complaint may be dismissed on the basis of an affirmative defense if the defense clearly appears by the face of the complaint); Williams v. Alhambra Sch. Dist. No. 68, 234 F.Supp.3d 971, 985 (D. Ariz. 2017) (declining to dismiss a claim where the allegations did not clearly demonstrate the applicability of the statute of frauds).

2.    Copyright Act Preemption

All state laws that are "equivalent to any of the exclusive rights within the general scope of copyright as specified by [§ 106] in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified in [§ 102 and § 103] . . . are governed exclusively by [the Copyright Act]."  17 U.S.C. § 301(a); see also Maloney v. T3 Media, Inc., 853 F.3d 1004, 1010 (9th Cir. 2017); Sybersound, 517 F.3d at 1150.  A two part test is used to determine whether a state law claim is preempted by § 301(a).  Maloney, 853 F.3d at 1010; Sybersound, 517 F.3d at 1150.  First, whether the subject matter of the state law claim falls

within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103.  Maloney, 853 F.3d at 1010; Sybersound, 517 F.3d at 1150.  Second, assuming that it does, whether the rights asserted under the state law are equivalent to the rights contained in 17 U.S.C. § 106, which identifies the exclusive rights of copyright holders.  Maloney, 853 F.3d at 1010; Sybersound, 517 F.3d at 1150.  Under the second prong, courts determine whether the state law claim contains an element not shared by a copyright claim; "an element which changes the nature of the action so that it is qualitatively different from the [copyright claim]."  Summit Mach. Tool Manufacturing. Corp. v. Victor CNC Sys., 7 F.3d 1434, 1439-40 (9th Cir. 1993) (quotation omitted); see Laws v. Sony Music Entm't, Inc., 448 F.3d 1134, 1143 (9th Cir. 2006); Altera Corp. v. Clear Logic, Inc., 424 F.3d 1079, 1089 (9th 2005).  In essence, courts should "engage in a fact-specific inquiry into the actual allegations underlying the claims at issue in the case, so as to determine whether the 'gravamen' of the state law claim asserted is the same as the rights protected by the Copyright Act."  Crafty Prods. v. Michaels Cos., 424 F.Supp.3d 983, 995 (S.D. Cal. 2019); Idema v. Dreamworks, Inc., 162 F.Supp.2d 1129, 1190 (C.D. Cal. 2001).

a.    Intentional Interference with Prospective Economic Advantage ("IIPEA")

The elements of an IIPEA claim are:  (1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action.  Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc., 2 Cal. 5th 505, 512 (2017).  The third element, a wrongful act, refers to an unlawful act that is proscribed by a constitutional, statutory, regulatory, common law, or other determinable standard such that it is independently wrongful of its interfering character.  Edwards v. Arthur Anderson LLP, 44 Cal.4th 937, 944 (2008).  IIPEA claims are more inclusive than intentional interference with contractual relations claims and do not require the existence of a valid contract. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1159 (2003).

The Counterclaim alleges that Morena was in an economic relationship with YouTube that would have resulted in economic benefit through uploading and commercially exploiting the

albums and cover art (advertisements would be placed in the videos which would generate revenue).  See Counterclaim ¶ 55.  Yellowcake and Colonize knew about Morena's economic relationship with YouTube and intended to disrupt it.  Yellowcake and Colonize sent fraudulent DMCA takedown notices[2] to YouTube, knowing that the notices would likely interfere with the economic relationship between Morena and YouTube.  See id. at ¶ 56.  The relationship was disrupted as YouTube agreed to clock Morena's video postings and to cease paying advertising revenues to Morena for the videos embodying the albums and cover art.  See id. at ¶ 57.  This disruption caused economic loss and harm to Morena.  See id.

First, the albums are sound recordings and thus, are entitled to copyright protection.  See 17 U.S.C. § 102(a)(7).  Further, the albums' respective cover art is also the subject of three registered copyrights as visual material.  See Counterclaim Ex. 3.  The registration indicates that the cover art is "artwork and photograph for digital sound recordings."[3]  The Copyright Office permits registration of cover art as an associated image of sound recordings.  EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 96-97 (2d Cir. 2016).  Therefore, the cover art is also subject to copyright protection.

Second, the IIPEA claim is based on Yellowcake and Colonize utilizing § 512 of the DMCA/Copyright Act to enforce what they believe to be their exclusive rights in the albums and cover art.  This led to YouTube prohibiting Morena from using YouTube's platform in connection with videos involving the albums and cover art.  In other words, Yellowcake and Colonize interfered with Morena's ability to exploit the albums by reproducing, distributing, displaying, and/or performing the albums through YouTube.  Morena's allegations call into question who has the ability to decide whether and how to display, copy, or make available the albums.  This is conduct within the ambit of § 106.  See 17 U.S.C. § 106; McGowan, 2020 U.S. Dist. LEXIS 229408 at *39-*40; Hoff, 2019 U.S. Dist. LEXIS 140343 at *17-*18; Worth, 5 F.Supp.2d at 822-23.

---

[2] "DMCA" refers to the Digital Millennium Copyright Act, and the takedown procedures of the DMCA are found at 17 U.S.C. § 512(c).  See Vernor v. Autodesk, Inc., 621 F.3d 1102, 1105 & n.3 (9th Cir. 2010).

[3] The Court takes judicial notice of search results on the Copyright Office website for the registrations of the cover art for the three albums.  Fed. R. Evid. 201; Kaseberg, 360 F.Supp.3d at 1026; Obodai, 840 F.Supp.2d at 715 n.1.

1     Morena argues that its IIPEA claim is qualitatively different because it includes allegations

2  that Yellowcake and Colonize interfered with Morena's right to possess and exploit the tangible

3  masters.  The Court agrees with Morena that claims based on the tangible masters themselves, as

4  opposed to the copyrighted albums, would be qualitatively different from a copyright infringement

5  claim.  However, the allegations under the IIPEA claim do not reasonably indicate that the

6  tangible masters have any relevance.

7     First, the allegations do not expressly mention the masters in any way.  While the IIPEA

8  cause of action does incorporate by reference all prior allegations, and the single prior paragraph

9  that includes allegations concerning the tangible masters (Paragraph 15) would be included in that

10 incorporation, the incorporation by reference is improper.  Paragraph 55 of the IIPEA claim

11 incorporates by reference all of the prior 54 paragraphs, including paragraphs that make up three

12 prior causes of action and paragraphs that have no relevance to an IIPEA claim.  See Counterclaim

13 ¶ 55.  This is an improper shotgun pleading technique that does not give proper notice to either

14 YCH or the Court that the tangible masters are intended to play a role in the IIPEA claim.[4]  See

15 Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1321-23 (11th Cir. 2015);

16 Deerpoint Grp., Inc. v. Agrigenix, LLC, 345 F.Supp.3d 1207, 1234 n.14 (E.D. Cal. 2018).

17    Second, it is unknown how the tangible masters could have been affected by the § 512

18 takedown notices and YouTube's corresponding decision to not permit Morena to post *videos* on

19 YouTube.  To the Court's knowledge, the tangible masters are not videos, they are sound/audio

20 recordings.  If anything, the videos being posted on YouTube would appear to be some form of

21 copy of the masters, not the tangible masters themselves.  Without additional allegations, it is

22 unreasonable to infer that the tangible masters form the basis of any IIPEA claim as alleged in the

23 Counterclaim.  See Seven Arts, 733 F.3d at 1254.

24    In sum, since Morena's IIPEA claim as pled is preempted by the Copyright Act, dismissal

25 is appropriate.  See Crafty Prods., 424 F.Supp.3d at 995-96; Idema, 162 F.Supp.2d at 1193.

26

27 [4] For any cause of action, not just the IIPEA claim, if prior paragraphs are intended to support that cause of action,
then Morena should incorporate by reference only those specific paragraphs, e.g. "paragraphs 14 through 17, 27, 38
and 42 are hereby incorporates by reference."  The wholesale incorporation by reference of all prior paragraphs, when

28 not all prior paragraphs are relevant and intended to support a cause of action, is improper.  Weiland, 792 F.3d at
1321-23; Deerpoint Grp., 345 F.Supp.3d at 1234 n.14.

1            <u>b.</u>      <u>Intentional Interference with Contractual Relations ("IICR")</u>

2       The elements of a cause of action for IICR are: (1) a valid contract between the plaintiff

3 and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional

4 acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or

5 disruption of the contractual relationship; and (5) resulting damage.  <u>Quelimane Co. v. Stewart</u>

6 <u>Title Guaranty Co.</u>, 19 Cal.4th 26, 55 (1998);  <u>Ghazarian v. Magellan Health, Inc.</u>, 53 Cal.App.5th

7 171, 191 (2020).  "To state a claim for disruption of a contractual relation, the plaintiff need not

8 show the defendant induced an actual or inevitable breach of the contract.  It is sufficient to show

9 the defendant's conduct made the plaintiff's performance, and inferentially enjoyment, under the

10 contract more burdensome or costly."  <u>Ghazarian</u>, 53 Cal.App.5th at 191 (quoting <u>Golden West</u>

11 <u>Baseball Co. v. City of Anaheim</u>, 25 Cal.App.4th 11, 51 (1994)).

12       The Counterclaim alleges that Hernandez met with Chavez and expressed interest in

13 exploiting the three albums.  <u>See</u> Counterclaim ¶ 61.  Although Chavez advised Hernandez that

14 Morena owned the albums, Hernandez intentionally misled Chavez by telling Chavez that Morena

15 had no rights in the albums.  <u>See</u> <u>id.</u> at ¶ 62.  Hernandez offered to Chavez significant money for

16 Chavez's rights in the albums and further induced Chavez to ignore his contractual obligations

17 through an offer to indemnify Chavez in the event Morena brought suit.  <u>See</u> <u>id.</u>  As a result,

18 Chavez entered into an agreement with Yellowcake for the transfer of his ownership and rights in

19 the albums and cover art even though Chavez had no such rights to grant.  <u>See</u> <u>id.</u> at ¶ 63.  This

20 interference with Morena's agreement with Chavez caused Morena harm.  <u>See</u> <u>id.</u> at ¶ 64.

21            <u>(1)</u>    <u>Preemption</u>

22       First, the albums and cover art are protected by the copyrights.  <u>See</u> 17 U.S.C. § 102(a);

23 <u>EMI Christian Music</u>, 844 F.3d at 96-97; Counterclaim Ex. 3.

24       Second, the allegations in essence complain that YCH induced Chavez to sell rights in the

25 albums that he did not have, presumably because Chavez had already transferred all of his rights

26 to Morena.  <u>See</u> Counterclaim ¶¶ 15, 17,  61, 62, 63.  In other words, the contract that was

27 allegedly breached involved the ownership of the albums and cover art.  These allegations do not

28 identify or involve any of the rights listed in § 106.  Section 106 of the Copyright Act grants

1  exclusive rights to a copyright holder to reproduce, prepare derivative works, distribute, perform,

2  and display the copyrighted work.  See 17 U.S.C. § 106; Maloney, 853 F.3d at 1010.

3         YCH contends that since ownership of the copyrights is at issue, then logically every right

4  enumerated in § 106 is at issue.  Admittedly, that argument has some appeal.  However, the fact

5  remains that Morena's IICR claim does not identify any single act that falls specifically within

6  § 106.  Morena is complaining about a breach of contract based on a transfer of an ownership

7  interest, it is not complaining about reproducing, distributing, performing, or making derivative

8  works.  Moreover, in the context of exclusive subject matter jurisdiction under 28 U.S.C. §

9  1338(a), the Ninth Circuit has held that "federal courts do not have jurisdiction over a suit on a

10 contract simply because a copyright is the subject matter of the contract."  Topolos v Caldewey,

11 698 F.2d 991, 993 (9th Cir. 1983).  Topolos explained that if a claim involves copyright

12 infringement or a matter directly related to interpretation or enforcement of the Copyright Act,

13 jurisdiction is present.  Id.  However, if a claim is "essentially for some common law or state-

14 created right, most generally for a naked declaration of ownership or contractual rights,

15 jurisdiction has been declined, even though the claim might incidentally involve a copyright of the

16 Copyright Act."  Id. (quoting Royalty Control Corp. v. Sanco, Inc., 175 U.S.P.Q. 641, 642 (N.D.

17 Cal. 1972)).  Thus, the mere fact that the contract between Chavez and Morena involved

18 ownership of copyrights is not enough to fully implicate the Copyright Act or for the Court to

19 conclude that any right within § 106 is the gravamen of the claim.  See id. at 993-94.

20        In sum, Morena's IICR claim is qualitatively different from a copyright infringement claim

21 because none of the rights listed in § 106 are the subject of the IICR claim.  Dismissal of this

22 claim on the basis of preemption is inappropriate.

23                    (2)    Pleading Deficiency[5]

24        "Section 204(a) not only bars copyright infringement actions but also breach of contract

25 claims based on oral agreements."  Valente-Kritzer Video v. Pinckney, 881 F.2d 772, 774 (9th Cir.

26 _____

27 [5] YCH's motion did not argue that the IICR cause of action was not plausibly pled.  However, the pleading deficiency identified in this section necessarily follows from the Court's analysis of the first cause of action.  Because a failure to state a claim can be raised even at trial, see Fed. R. Civ. P. 12(h)(2), and because the deficiency is fatal to part of the

28 IICR cause of action, the Court addresses the matter sua sponte at this time.  See Omar v. Sea Land Service, Inc., 813 F.2d 986, 991 (9th Cir. 1987).

1  1989); Johnson v. Altamirano, 418 F.Supp.3d 530, 556 (S.D. Cal. 2019).  Here, Morena's IICR

2  claim is based on YCH inducing Chavez to transfer his copyright interests to YCH, even though

3  those transfers were the subject of an oral agreement between Chavez and Morena.  Therefore, in

4  order for YCH's conduct in inducing the transfer of copyrights from Chavez to YCH to be

5  wrongful, a valid contract between Morena and Chavez for the transfer of those copyrights is an

6  essential element of Morena's IICR claim.  See Johnson, 418 F.Supp.3d at 555-56; Quelimane, 19

7  Cal.4th at 55.  However, as explained above, § 204(a) operates to invalidate the oral contract

8  between Morena and Chavez to the extent that the oral contract included the transfer of copyright

9  ownership in the albums.[6]  See Valente-Kritzer Video, 881 F.2d at 774; Johnson, 418 F.Supp.3d at

10 556.  That is, through operation of § 204(a), there is no valid contract between Chavez and Morena

11 for the transfer of Chavez's copyright interests in the albums.  See Johnson, 418 F.Supp.3d at 555-

12 56.  Therefore, any IICR claim based on the purported transfer of Chavez's ownership of the

13 copyrights in the three albums fails because Morena cannot establish the first essential element of

14 an IICR claim.  See id.; Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture

15 Partners, 52 Cal.App.4th 867, 879 (1997); A-Mark Coin Co. v. General Mills, Inc., 148

16 Cal.App.3d 312, 322 (1983).  Dismissal of the IICR claim is appropriate to the extent that the

17 claim is based on ownership interests or the transfer thereof in the three albums.[7]  See Valente-

18 Kritzer Video, 881 F.2d at 774; Johnson, 418 F.Supp.3d at 556; Bed, Bath & Beyond, 52

19 Cal.App.4th at 879; A-Mark Coin Co., 148 Cal.App.3d at 322.

20              c.    UCL

21       The UCL broadly proscribes the use of any "unlawful, unfair or fraudulent business act or

22 practice."  Cal. Bus. & Prof. Code. § 17200; Beaver v. Tarsadia Hotels, 816 F.3d 1170, 1177 (9th

23 Cir. 2016). "The UCL operates as a three-pronged statute:  'Each of these three adjectives

24 [unlawful, unfair, or fraudulent] captures a 'separate and distinct theory of liability.'"  Beaver, 816

25

26 [6] YCH did not move to dismiss the second cause of action for copyright infringement based on the three albums'
   cover art.  Therefore, the analysis in this section does not apply to issues surrounding the cover art.

27 [7] Again, in the absence of argument on the issue, the IICR claim will not be dismissed to the extent that it is related to
28 ownership interests in the cover art.

                                        23

F.3d at 1177 (citation omitted).  The UCL's "unlawful" prong "borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL," and "virtually any law or regulation — federal or state, statutory or common law — can serve as a predicate . . . ." Candelore v. Tinder, Inc., 19 Cal.App.5th 1138, 1155 (2018).  When the underlying legal claim that supports a UCL cause fails, however, "so too will the [the] derivative UCL claim."  AMN Healthcare, Inc. v. Aya Healthcare Services, Inc., 28 Cal.App.5th 923, 950 (2018).  "A business practice is 'fraudulent'' under the UCL if members of the public are likely to be deceived."  Davis v. HSBC Bank, 691 F.3d 1152, 1169 (9th Cir. 2012); Puentes v. Wells Fargo Home Morg., Inc., 160 Cal.App.4th 638, 645 (2008).  Unless a particular disadvantaged or vulnerable group is targeted, whether conduct is "fraudulent" is judged by the effect the conduct would have on a reasonable consumer.  Puentes, 160 Cal.App.4th at 645.  Finally, California law with respect to "unfair" conduct is currently "in flux."  Hodsdon v. Mars, Inc., 891 F.3d 857, 866 (9th Cir. 2018).  Conduct is "unfair" either when it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition," or when it 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  Id.

The Counterclaim alleges that Yellowcake and Colonize are reproducing and performing, or benefitting financially from, aiding, encouraging, enabling, inducing causing, materially contributing to, or otherwise facilitating the reproduction and performance of Morena's statutory and common law rights in the albums and cover art and have engaged in common law misappropriation.  See Counterclaim ¶ 67.  Hernandez also induced Chavez to breach his agreement with Morena in order to obtain rights which Chavez had no right to give.  See id.  The Counterclaim alleges that this conduct is unfair and constitutes unfair, unlawful, or deceptive practices under Cal. Bus. & Prof. Code § 17200.  See id. at ¶ 68.

<u>(1)</u>      <u>Yellowcake and Colonize</u>

First, as discussed above, the albums and cover art are protected by the copyright act.  See 17 U.S.C. § 102; EMI Christian Music, 844 F.3d at 96-97.

Second, the conduct alleged in Paragraph 67 involves reproducing and performing the albums and cover art and engaging in common law misappropriation.  Reproducing and performing are actions that are expressly listed as exclusive rights in § 106.  See 17 U.S.C. § 106; Maloney, 853 F.3d at 1010.

Common law misappropriation is covered under the umbrella of unfair competition and is "normally invoked in an effort to protect something of value not otherwise covered by patent or copyright law, trade secret law, breach of confidential relationship, or some other form of unfair competition."  City Solutions, Inc. v. Clear Channel Communications, 365 F.3d 835, 842 (9th Cir. 2004).  The elements of a California common law misappropriation claim are:  (1) the plaintiff made a substantial investment of time, effort and money into creating the thing misappropriated such that the court can characterize that "thing" as a kind of property right; (2) the defendant appropriated the "thing" at little or no cost, such that the court can characterize defendant's actions as "reaping where it has not sown;" and (3) the defendant injured plaintiff by the misappropriation. Hollywood Screentest of Am., Inc. v. NBC Universal, Inc., 151 Cal. App. 4th 631, 650 (2007). The only "things" that are identified as "misappropriated" are the albums and cover art, see Counterclaim ¶ 67, both of which are protected by the Copyright Act.  Further, the only alleged conduct that could readily be considered appropriation are the acts of reproducing, displaying, and performing, all of which are exclusive rights that belong to a copyright owner under § 106.

Morena's opposition generally argues that the involvement of the tangible masters makes all of its claims qualitatively different from an infringement claim.  However, as explained in the Court's analysis of the IIPEA claim, notice in the Counterclaim of the involvement of or dependence on the tangible masters in the UCL claim is not fairly provided through Morena's improper incorporation by reference of literally all previous paragraphs, particularly since the term the term "tangible master" was used in one sentence of one preceding paragraph (Paragraph 15). Further, apart from the notice problems, it is unclear how the tangible masters truly fit within the conduct alleged in Paragraph 67 given other allegation involving digital mediums such as YouTube.  Therefore, Morena's reliance on the tangible masters does not reasonably fit within the allegations actually made within the Counterclaim.

1    Because the Court finds that the acts of reproducing, performing, and "misappropriating"

2    are actions covered by § 106, the UCL claims against Yellowcake and Colonize are preempted by

3    the Copyright Act.  See Kodadek v. MTV Networks, Inc., 152 F.3d 1209, 1213 (9th Cir. 1998);

4    Media.net Adver. FZ-LLC v. NetSeer, Inc., 156 F.Supp.3d 1052, 1074-75 (N.D. Cal. 2016).

5                          (2)    Hernandez

6        The Counterclaim alleges that Hernandez induced Chavez to breach his agreement with

7    Morena.  No other conduct by Hernandez is expressly identified under the UCL claim.  See

8    Counterclaim ¶¶ 67-70.

9                          (A)    Preemption

10       Inducing a breach of contract by facilitating a transfer of copyrighted works does not

11   encompass any exclusive right under § 106.  Therefore, the UCL claim against Hernandez is

12   qualitatively different from a copyright infringement claim and not preempted by § 301.

13                         (B)    Pleading Defect[8]

14       Inducing a breach of contract is part of an IICR claim, specifically it is one of two ways to

15   satisfy the third element of that cause of action.  As discussed above, through operation of

16   § 204(a), there is no valid contract between Morena and Chavez for the transfer of a copyright in

17   the albums.  See Valente-Kritzer Video, 881 F.2d at 774; Johnson, 418 F.Supp.3d at 556.  Without

18   a valid contract, no breach can be induced.  See Johnson, 418 F.Supp.3d at 556; Bed, Bath &

19   Beyond, 52 Cal.App.4th at 879; A-Mark Coin Co., 148 Cal.App.3d at 322.  In other words,

20   Hernandez did not and could not induce Chavez to breach a valid agreement for the transfer of

21   copyrights in the three albums.  Without inducement, there is no wrongful conduct that could be

22   considered "unfair," "fraudulent," or "unlawful."  Thus, because there is no plausible or viable

23   claim, dismissal of any UCL claim that relates to the three albums or transfer thereof is proper.[9]

24   See AMN Healthcare, 28 Cal.App.5th at 950.

25   ───────────────────────

26   [8] Like the IICR claim, YCH's motion did not argue that the UCL cause of action was not plausibly pled.  However, the pleading deficiency identified in this section necessarily follows from the Court's analysis of the first cause of action and the IICR claim.  Because the deficiency is fatal to part of the UCL claim, the Court addresses the matter

27   sua sponte at this time.  See Omar, 813 F.2d at 991.

28   [9] Because YCH does not address any issues surrounding the cover art, the analysis of this subsection is limited to actions involving the three albums.

1       <u>d.</u>    <u>Conversion</u>

2       Conversion is "an act of willful interference with a chattel, done without lawful

3 justification, by which any person thereto is deprived of use and possession." <u>De Vries v.</u>

4 <u>Brumback</u>, 53 Cal.2d 643, 647 (1960).  Stated differently, conversion is "the wrongful exercise of

5 dominion over the property of another." <u>Lee v. Hanley</u>, 61 Cal.4th 1225, 1240 (2015); <u>Hester v.</u>

6 <u>Public Storage</u>, 49 Cal.App.5th 668, 680 (2020).  The elements of conversion are:  (1) the

7 plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a

8 wrongful act or disposition of property rights; and (3) damages. <u>Lee</u>, 61 Cal.4th at 1240; <u>Hester</u>,

9 49 Cal.App.5th at 680.  To establish conversion, a plaintiff must show an actual and substantial

10 interference with his ownership or right to posses the property. <u>Zaslow v. Kroenert</u>, 29 Cal.2d

11 541, 550-51 (1946).  The measure of damages for a conversion claim is the full value of the

12 property converted. <u>General Security Servs. Corp. v. County of Fresno</u>, 815 F.Supp.2d 1123,

13 1143 (E.D. Cal. 2011); <u>Intel Corp. v. Hamidi</u>, 30 Cal.4th 1342, 1350 (2003): <u>Irwin v. McDowell</u>,

14 91 Cal. 119, 122 (1891).

15       The Counterclaim in relevant part alleges that Morena owns the tangible master recordings

16 for the three albums and that Yellowcake intentionally interfered with Morena's ownership in that

17 property by exercising dominion over the masters, exploiting the masters, claiming ownership in

18 the masters, and interfering with Morena's ability to commercially exploit the masters. <u>See</u>

19 Counterclaim ¶¶ 72, 73.

20       The Ninth Circuit has recognized that claims for the conversion of tangible property

21 involve actions different from those proscribed in the copyright laws and thus, are not preempted.

22 <u>Oddo</u>, 743 F.2d at 635.  "While conversion is generally immune from preemption because it

23 involves tangible property, conversion actions seeking only damages for reproduction of the

24 property – not return of tangible property – are preempted by the Copyright Act." <u>Doody v.</u>

25 <u>Penguin Group (USA), Inc.</u>, 673 F.Supp.2d 1144, 1164-65 (D. Haw. 2009); <u>Marketing Info.</u>

26 <u>Masters, Inc. v. Board of Trs. of Cal. St. Univ. Sys.</u>, 552 F.Supp.2d 1088, 1098 (S.D. Cal. 2008);

27 <u>Firoozye v. Earthlink Network</u>, 153 F.Supp.2d 1115, 1130 (N.D. Cal. 2001).

28       Morena's invocation of the tangible masters, as opposed to the albums/sound recordings

embodied within the masters which are subject to copyright protection, see 17 U.S.C. § 102(a)(7), is clearly an attempt to fit this claim within *Oddo*.  However, the Court is not satisfied that Morena has alleged a viable claim, either in terms of *Oddo* or pleading the elements of conversion.

First, neither allegations under the conversion claim nor the prayer for relief request the return of the tangible masters.  Instead, Morena alleged that it was harmed according to proof.  This is indicative of a preempted copyright claim.  Doody, 673 F.Supp.2d at 1164-65

Second, the Court understands that Morena is alleging that Yellowcake "exploited" the masters by reproducing them and making them available on platforms such as YouTube.  The Court takes this to mean copying and distributing or displaying them through YouTube.  Otherwise, it is unclear how tangible masters can be utilized through YouTube or other digital and on-line mediums since, to the Court's knowledge, the tangible masters are not videos.  Similarly, the Court understands that Morena was attempting to exploit the masters in the same way as Yellowcake, but Yellowcake interfered through takedown notices and threats of litigation.

Morena's allegations regarding exploiting the tangible masters on digital platforms like YouTube seem like a copyright infringement claim.  Section 106 grants "copyright owners the 'exclusive rights' to display, perform, reproduce, or distribute copies of a copyrighted work, to authorize others to do those things, and to prepare derivative works based upon the copyrighted work."  Maloney, 853 F.3d at 1010.  The only difference between the conversion cause of action and copyright infringement appears to be that the tangible masters are the "works" at issue.  Morena appears to be treating the tangible masters the same as or interchangeably with the copyrighted albums.  Without additional allegations that adequately distinguish between the tangible masters and the copyrighted albums, as well as clarification of how the tangible masters, as opposed to the copyrighted albums, were being "exploited" on digital platforms like YouTube, the Court cannot find that Morena has affectively pled around § 301 preemption with respect to "exploitation" of the masters.

Third, and relatedly, it is unclear what exactly Morena means by the allegation of "exercising dominion."  While it is possible to read this as an allegation that Yellowcake physically possessed Morena's masters, that is not what is expressly alleged, nor do the

circumstances surrounding this case reasonably indicate that Yellowcake took physical possession of, or took any actions directly against, Morena's tangible masters.  Additional allegations are necessary to explain how exactly Yellowcake "exercised dominion" over the tangible masters.

Fourth, it is unclear how Yellowcake claimed ownership of the tangible masters (or how merely claiming ownership in general) constitutes such a substantial interference with the tangible masters that Yellowcake would be required to pay Morena the full value of the tangible masters. Additional allegations are necessary because the allegations in the Counterclaim do not reasonably suggest that Yellowcake somehow took the tangible masters or actually interfered with the tangible masters.  Instead, it appears that Morena is attempting to rebrand an infringement claim into a conversion claim by relying on the tangible masters instead of the copyrighted albums.

Finally, interfering with Morena's ability to commercially exploit the tangible masters does not appear to be an act of conversion.  Such interference does not affect either actual ownership of the tangible masters or Morena's right to possess the tangible masters.  The ability to commercially exploit the masters is perhaps a benefit of ownership, but it is not the same as ownership and also would not appear to justify the full value of the tangible masters as damages.

In sum, because the factual allegations do not plausibly indicate that Yellowcake converted the physical/tangible masters, and because the allegations do not sufficiently remove the conversion claim from § 301 preemption, dismissal of the conversion claim is appropriate.

## IV.     Conclusion

YCH has moved to dismiss all claims, except for the second cause of action for copyright infringement involving the cover art.

With respect to the first cause of action, a valid ownership interest has not been pled.  The agreement to transfer between Chavez and Morena is invalid under § 204(a) because the agreement was oral.  This defect cannot be remedied, so the dismissal of any infringement claim based on a transfer of copyrights through the oral agreement will be without leave to amend.  The co-author/joint owner theory does not yield a plausible claim because the pleadings indicate that the joint owners of the copyright in the three albums would be Morena and Yellowcake, and joint

owners may not sue each other for copyright infringement.  Dismissal of this infringement claim will be with leave to amend.  However, Morena must be able to explain why Yellowcake is not a joint owner of the copyrights in the albums.  Finally, the allegations categorically show that the albums were not works for hire as specially commissioned works.  The allegations are also insufficient to show that the albums were a work for hire based on Chavez being an employee who was acting within the scope of his employment for Morena when the albums were created.  Because it is not clear that amendment of this employee work for hire theory would be futile, dismissal will be with leave to amend.

With respect to the third cause of action, a preliminary injunction is not a cause of action, it is a remedy.  Therefore, dismissal of the request as a standalone cause of action is appropriate.

With respect to the IIPEA cause of action, that claim as pled is preempted by the Copyright Act.  However, because it is not entirely clear that amendment would be futile with respect to a claim based on the tangible masters, dismissal will be with leave to amend to add such a claim.

With respect to the IIRC claim, YCH has not adequately shown that this cause of action is preempted by the Copyright Act.  However, application of § 204(a) invalidates any contract for the transfer of Chavez's copyrights in the three albums to Morena.  Without a valid contract, there is not a plausible IIRC claim.  Therefore, dismissal of the IIRC claim to the extent that it is based on a contract for the transfer of copyrights in the three albums between Chavez and Morena will be without leave to amend.

With respect to the UCL cause of action, the claims against Yellowcake and Colonize are preempted by the Copyright Act.  With respect to Hernandez, while the Copyright Act does not preempt the UCL claim, no plausible UCL claim based on Hernandez inducing Chavez to transfer his interests in the copyrights of the three albums can be stated because of application of § 204(a).  Therefore, dismissal of the UCL claim against Hernandez to the extent that it is based on inducing a breach of the oral contract for the transfer of copyrights in the three albums between Chavez and Morena will be without leave to amend.

With respect to the conversion cause of action, no plausible claim is alleged.  Additional allegations are necessary to clarify what actions Yellowcake took with respect to the tangible

1  masters that would rise to the level of conversion and justify the full value of the tangible masters

2  as damages.  Further, the allegations in the Complaint suggest that Morena may be attempting to

3  artfully plead a copyright infringement claim as a conversion claim, and thus avoiding preemption,

4  by focusing on the tangible masters instead of the copyrighted albums.  Thus, the claim appears to

5  be preempted.  However, because it is not clear that amendment would be futile, dismissal will be

6  with leave to amend.

7

8  **V.      Validity of Morena's Copyright Registrations in the Three Albums**

9       The Copyright Act in relevant part provides that "no civil action for infringement of the

10  copyright any United States work shall be instituted until preregistration or registration of the

11  copyright claim has been made in accordance with [the Copyright Act]."  17 U.S.C. § 411(a).

12  While this section does not impose a precondition to copyright protection, it does expressly

13  prohibit "copyright owners from bringing infringement actions without first properly registering

14  their work."  Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 959 F.3d 1194, 1197 (9th Cir.

15  2020); see also Alaska Stock, 747 F.3d at 678.

16       The Ninth Circuit has explained that, "once a defendant alleges that (1) a plaintiff's

17  certificate of registration contains inaccurate information; (2) 'the inaccurate information was

18  included on the application for copyright registration'; and (3) the inaccurate information was

19  included on the application 'with knowledge that it was inaccurate,' a district court is then

20  required to submit a request to the Register of Copyrights 'to advise the court whether the

21  inaccurate information, if known, would have caused [it] to refuse registration.'"  Unicolors, 959

22  F.3d at 1197 (quoting 17 U.S.C. § 411(b)(1)-(2)).  Courts may "not consider in the first instance

23  whether the Register of Copyrights would have refused registration due to the inclusion of known

24  inaccuracies in a registration application."  Id.  Additionally, "inadvertent mistakes on registration

25  certificates do not invalidate a copyright and thus do not bar infringement actions, unless . . . the

26  alleged infringer has relied to its detriment on the mistake, or the claimant intended to defraud the

27  Copyright Office by making the misstatement."  Jules Jordan Video, 617 F.3d at 1156 (quoting

28  Lamps Plus, Inc. v. Seattle Lighting Fixture Co., 345 F.3d 1140, 1145 (9th Cir. 2003)); see also

1   Gold Value, 925 F.3d at 1146.  If it is determined that a registration contains inaccurate

2   information, and that the inaccurate information was included in the registration application with

3   knowledge that the information was incorrect, and that the inaccurate information would have

4   caused the Copyright Office to refuse registration, then a district court may declare the registration

5   invalid.  See Gold Value, 925 F.3d at 1148; see also Unicolors, 959 F.3d at 1200.

6          Here, the work for hire theory for Morena's ownership interest was brought to the Court's

7   attention by YCH through judicially noticed documents from the U.S. Copyright Office's Public

8   Catalog website, i.e. the registration information for the three albums.  The registration

9   information indicates that Morena is the author of the three albums as an "employer for hire."  See

10  Berman Reply Dec. Exs. A, B, C.  Neither Chavez nor Yellowcake are mentioned on the

11  registration information.  See id.  YCH argues that the absence of any written agreement, or even

12  the allegation of a written agreement, make the work for hire/"employer for hire" status of Morena

13  false.  YCH argues that Morena had knowledge that the work for hire theory was false, and also

14  knew of Yellowcake's registration at the time that Morena filed for its registrations.  YCH

15  contends that because Morena knew of the falsity of its representations to the Copyright Office,

16  and because the Copyright Office would not have granted registration with knowledge of the true

17  information, the Court should invalidate Morena's registrations.

18         After review, the Court agrees that the judicially noticed registration information is

19  inconsistent with the Counterclaim.  The Counterclaim does not claim an ownership interest in the

20  three albums through any work for hire theory.  Instead, the Counterclaim attempts to claim

21  ownership through either a transfer agreement with Chavez or as a co-author/joint owner.  The

22  Counterclaim therefore indicates that the registrations contain incorrect information in terms of

23  authorship.  Further, while not expressly mentioning the copyright application, YCH is clearly

24  alleging that Morena knew that it was submitting false information to the Copyright Office as part

25  of the registration application.  Under Unicolors, these allegations and the judicially noticed

26  documents are sufficient to put the validity of Morena's copyright registrations at issue.

27         At this point, however, noting that the validity of the registrations is as far as the Court can

28  go.  First, no inquiry has been sent to the Copyright Office regarding inaccurate information.  As

*Unicolors* expressly states, this Court cannot invalidate a copyright until it receives word from the Copyright Office regarding what effect the known inaccuracy would have had on the registration decision.  See id. at 1197.  Therefore, invalidating the registrations at this point is clearly improper.  See id.  Second, and more fundamentally, YCH's arguments have been made for the first time as part of a reply.  Morena has not had an opportunity to explain what was actually submitted in its application to the Copyright Office, explain the inconsistency between the Counterclaim and the registration information, address the issue of knowledge or inadvertence, or otherwise respond to YCH's allegations.[10]

Under these circumstances, the Court will order the parties to submit additional briefing.  Morena will be permitted to respond to the challenges to the validity of its registrations.  Of particular import, Morena should attempt to explain the apparent inaccuracies in the registration information and explain what information was presented as part of its registration application.  The Court will then permit YCH to reply to Morena's supplemental response.  If, after reviewing the supplemental information, the Court is satisfied that there is inaccurate information that is part of the registrations and that was included in the applications to the Copyright Office, the Court will send an inquiry as required by § 411/*Unicolors* to determine how the Copyright Office would have reacted.  However, once the Court receives the response of the Copyright Office, and depending on the response, the Court will not invalidate the registration until the issue of Morena's knowledge/inadvertence has been decided.

The issue of the registrations' validity is not one that should delay proceedings further.  Assuming that the Court sends an inquiry to the Copyright Office, that inquiry will not affect the second cause of action.  Further, even if Morena files an amended Counterclaim and continues to pursue an infringement claim with respect to the albums, it seems unlikely that the issue of knowledge or inadvertence will be able to be decided before either a summary judgment motion or a trial.  Therefore, the pre-trial and scheduling process will not be stayed pending either receipt of the supplemental briefing or a possible response from the Copyright Office.

---

[10] Relatedly, while the submissions at this time suggest knowledge by Morena, the issue of knowledge has not been litigated or decided.

1

**ORDER**

2

     Accordingly, IT IS HEREBY ORDERED that:

3  1.    Counter-Defendants' Rule 12(b)(6) motion to dismiss is GRANTED in part in part as

4         follows:

5         a.     The first cause of action for copyright infringement based on a transfer agreement

6               between Chavez and Morena is DISMISSED without leave to amend;

7         b.     The first cause of action for copyright infringement based on a work for hire

8               through a special order or commission is DISMISSED without leave to amend;

9         c.     The first cause of action for copyright infringement based on  either a co-

10               author/joint owner or work for hire through an employer-employee relationship is

11               DISMISSED with leave to amend;

12         d.     The third cause of action for preliminary injunction is DISMISSED without

13               prejudice as this is a remedy and not a cause of action;[11]

14         e.     The fourth cause of action for intentional interference with prospective economic

15               advantage is DISMISSED and leave to amend is granted only with respect to a

16               claim based on the tangible masters;

17         f.     The fifth cause of action for intentional interference with contractual relations to

18               the extent that it is based on a contract involving the transfer of copyrights in the

19               three albums is DISMISSED without leave to amend;

20         g.     The sixth cause of action for Cal. Bus. & Prof. Code § 17200 UCL against

21               Yellowcake and Colonize is DISMISSED without leave to amend as preempted;

22         h.     The sixth cause of action for Cal. Bus. & Prof. Code § 17200 UCL against

23               Hernandez based on inducement to breach an agreement relating to copyright

24               ownership in the three albums is DISMISSED without leave to amend; and

25         i.     The seventh cause of action for conversion based on actions directed against the

26               tangible masters is DISMISSED with leave to amend;

27

28

[11] To be clear, Morena is free to request a preliminary injunction under the Copyright Act either in its Prayer for Relief or as part of the allegations under a copyright infringement cause of action.

2.  Within twenty-one (21) days of service of this order, Morena may file an amended counterclaim that is consistent with the analysis of this order;

3.  If Morena fails to timely file an amended Counterclaim, leave to amend shall be automatically withdrawn without further notice, and Defendants shall file an answer to the Counterclaim within twenty-eight (28) days of service of this order;

4.  Within fourteen (14) days of service of this order, Morena shall file supplemental briefing, as discussed above, that addresses and responds to the arguments made in the Counter-defendants' reply brief concerning the validity of Morena's copyright registrations in the three albums; and

5.  Within seven (7) days of service of Morena's supplemental briefing, Counter-defendants shall file a response.

IT IS SO ORDERED.

Dated:   March 1, 2021

SENIOR  DISTRICT  JUDGE