UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YELLOWCAKE, INC., | CASE NO. 1:20-CV-0787 AWI BAM |
| **Plaintiff** | |
| v. | **ORDER ON COUNTER-DEFENDANTS' MOTION TO DISMISS** |
| MORENA MUSIC, INC., and EDUARDO LEON dba Long Play Music, and DOES 1-50 inclusive, | (Doc. No. 41) |
| **Defendants** | |
| _____ | |
| MORENA MUSIC, INC, | |
| **Count-Plaintiff** | |
| v. | |
| YELLOWCAKE, INC., COLONIZE MEDIA, INC., and JOSE DAVID HERNANDEZ, | |
| **Counter-Defendants** | |

This is a copyright dispute involving three musical albums by the artist Los Originales De San Juan.  Through a First Amended Counterclaim ("FAC"), Counter-Plaintiff Morena Music, Inc. ("Morena") brings claims against Counter-Defendants Yellowcake, Inc. ("Yellowcake"), Colonize Media, Inc. ("Colonize"), and Jose Hernandez ("Hernandez") (collectively "YCH") for two copyright violations under the Copyright Act (17 U.S.C. § 100 et seq.) involving the albums and associated cover art, and a state law claim for unfair competition (Cal. Bus. & Prof. Code § 17200 et seq.) ("UCL").  Currently before the Court is YCH's second Rule 12(b)(6) motion to dismiss two of the three claims alleged against them.  For the reasons that follow, YCH's motion will be granted.

1

**RULE 12(b)(6) FRAMEWORK**

2       Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the

3  plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

4  Counterclaims are subject to Rule 12(b)(6) challenges.  See Seismic Reservoir 2020, Inc. v.

5  Paulsson, 785 F.3d 330, 335 (9th Cir. 2015).  A dismissal under Rule 12(b)(6) may be based on

6  the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a

7  cognizable legal theory.  Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015).  In

8  reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken

9  as true and construed in the light most favorable to the non-moving party.  Kwan v. SanMedica,

10  Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017).  However, complaints that offer no more than "labels

11  and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

12  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793

13  F.3d 1005, 1008 (9th Cir. 2015).  The Court is "not required to accept as true allegations that

14  contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or

15  allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

16  inferences."  Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254

17  (9th Cir. 2013).  To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual

18  matter, accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at

19  678; Mollett, 795 F.3d at 1065.  "A claim has facial plausibility when the plaintiff pleads factual

20  content that allows the court to draw the reasonable inference that the defendant is liable for the

21  misconduct alleged."  Iqbal, 556 U.S. at 678; Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir.

22  2013).  "Plausibility" means "more than a sheer possibility," but less than a probability, and facts

23  that are "merely consistent" with liability fall short of "plausibility."  Iqbal, 556 U.S. at 678;

24  Somers, 729 F.3d at 960.  The Ninth Circuit has distilled the following principles for Rule

25  12(b)(6) motions: (1) to be entitled to the presumption of truth, allegations in a complaint or

26  counterclaim may not simply recite the elements of a cause of action, but must contain sufficient

27  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

28  effectively; (2) the factual allegations that are taken as true must plausibly suggest entitlement to

relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.  Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014).  If a motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made . . . ."  Ebner v. Fresh, Inc., 838 F.3d 958, 962 (9th Cir. 2016).  However, leave to amend need not be granted if amendment would be futile or the plaintiff has failed to cure deficiencies despite repeated opportunities.  Garmon v. County of L.A., 828 F.3d 837, 842 (9th Cir. 2016).

**BACKGROUND**

From the FAC, Morena is a record label that is in the business of producing, manufacturing, distributing, exploiting, selling, and licensing sound and audio-visual recordings and artwork.  Jesus Chavez Sr. ("Chavez") is the founder and principal of the musical group Los Originales De San Juan, a popular Mexican musical group.

On September 16, 2013, Morena entered into an oral recording agreement with Chavez whereby Morena commissioned Chavez to provide services as a recording artist in the making of sound and audio-visual recordings for three albums (50 Mentadas, 15 Corridos Inmortales, and Celebrando 39).  Pursuant to the agreement, Morena agreed to: (1) select the musical compositions to be recorded on the albums; (2) commission and/or provide the sound engineers and audio-visual directors; (3) produce the musical performances on the albums; (4) direct the recording and filming of musical and audiovisual performances to be embodied on the albums; and (5) pay Chavez a fixed amount per album.  Chavez agreed to follow Morena's artistic direction, perform the recordings, and grant Morena the non-exclusive right to utilize Chavez's likeness and his group's name.  Morena performed the above services and thereby contributed sufficient originality to the albums such that Morena at a minimum is a co-author, co-owner, or joint owner of the copyrights in the albums for purposes of the Copyright Act.  Morena also produced, created, and designed the album cover art for each of the three albums.  Morena also registered copyrights in the content of the three albums and in the cover art of the three albums.  Morena alleges that it is the exclusive copyright owner of the cover art and at least a co-owner of the albums with Chavez.

1    In April 2019, Hernandez had a meeting with Chavez.  At the meeting, Hernandez

2    intentionally and willfully misled Chavez into mistakenly believing that Morena had no rights in

3    the Los Originales' albums and cover art and that Chavez was free to sell all rights in the works

4    exclusively to Yellowcake and Colonize.  Hernandez offered Chavez a significant amount sum of

5    money and promise to indemnify to purchase the exclusive rights in the albums and cover art.

6    Hernandez engaged in fraudulent or wrongful conduct.  As a result, Chavez purportedly entered

7    into an agreement ostensibly to sell the entirety of all right, title, and interest in and to the albums

8    and cover art exclusively to Yellowcake.  However, Chavez did not possess such exclusive rights

9    to grant in their entirety, which allegedly rendered such agreement void ab initio.

10    On December 21, 2019, Morena discovered that Yellowcake and Colonize created or

11    caused the creation of copies of the three Los Originales albums and cover art and was

12    distributing, selling and exploiting these works through online platforms such as ITunes, Amazon

13    Music, and YouTube.  This was done without Morena's authorization.  Yellowcake sent

14    correspondences to Morena in which Yellowcake was claiming ownership of the masters and

15    sound recordings of the three albums.

16    Yellowcake and Colonize sent fraudulent takedown notices to YouTube that falsely

17    claimed that Morena had no right to post or upload the three albums and cover art.  Prior to the

18    takedown notices, Morena had received significant revenue from YouTube, and the YouTube

19    uploads provided an important and lucrative marketing channel for the three albums and cover art.

20    Now, YCH's uploads of the albums and cover art have generated substantial revenue on YouTube.

21    However, Yellowcake and Colonize do not possess exclusive right or license from Chavez and

22    Morena as co-owners to use and exploit the albums and cover art and thus, have no authority to

23    engage in the on-going reproduction, use, and or display of the albums and cover art.

24

25    **COUNTER-DEFENDANTS' MOTION TO DISMISS**

26    **I.**    **First Cause of Action – Copyright Infringement of Sound Recordings**

27    *Counter-Defendants' Arguments*

28    Yellowcake argues that in the prior motion to dismiss, the Court held that Morena could

4

1  maintain a copyright infringement claim as a joint owner of the albums if it could show that
2  Yellowcake was not a joint owner.  However, the FAC expressly alleges that Morena is a co-
3  owner of the albums and fails to show that Yellowcake is not a co-owner.  It is concrete law that
4  co-owners of a copyright cannot sue another co-owner for copyright infringement.

5      In reply, Yellowcake argues that Morena's reliance on the rule that a co-owner cannot
6  grant an exclusive license without the permission of the other co-owners of the copyright is
7  misplaced.  In the Court's prior dismissal order, the Court recognized that there was no dispute
8  that Chavez entered into a written transfer agreement with Yellowcake and that, while Chavez as a
9  co-owner could not transfer exclusive interests, he could transfer his own ownership interest.  The
10  Court recognized that if Morena is a joint owner, the effect of the transfer agreement between
11  Morena and Chavez was to make Morena and Yellowcake joint owners of the copyrights.
12  Therefore, the fact that Chavez could not transfer an exclusive license if he was merely a co-owner
13  does not mean that Yellowcake is not at least a co-owner of the copyright with Morena.

14      *Counter-Plaintiff's Opposition*

15      Morena argues that it has alleged that it is at least a co-owner of the copyright in the
16  albums with Chavez.  A co-owner cannot unilaterally grant exclusive rights in a copyright without
17  the agreement of all other co-owners.  The FAC establishes that any document purporting to grant
18  Yellowcake exclusive rights in the copyrights is void ab initio because Morena never agreed to
19  allow Chavez to assign exclusive rights and Chavez alone did not possess such exclusive rights to
20  sell.  Therefore, Morena is not a co-owner with Yellowcake even if there is no dispute that
21  Yellowcake and Chavez entered into a written transfer agreement.  Accepting the allegations as
22  true, the Court must deny dismissal.

23      *Legal Standard*

24      "The Copyright Act affords copyright owners the 'exclusive rights' to display, perform,
25  reproduce, or distribute copies of a copyrighted work, to authorize others to do those things, and to
26  prepare derivative works based upon the copyrighted work."  Maloney v. T3Media, Inc., 853 F.3d
27  1004, 1010 (9th Cir. 2017); see 17 U.S.C. § 106.  Only the "legal or beneficial owner of an
28  exclusive right under a copyright" has standing to sue for infringement of that right.  Righthaven

1  LLC v. Hoehn, 716 F.3d 1166, 1169 (9th Cir. 2013).  A claim for copyright infringement has two

2  basic elements:  (1) ownership of a valid copyright, and (2) copying of constituent elements of the

3  work that are original.  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 351 (1991); Great

4  Minds v. Office Depot, Inc., 945 F.3d 1106, 1110 (9th Cir. 2019); Seven Arts, 733 F.3d at 1254.

5  "To plead ownership, [a plaintiff] must plausibly allege it owns a valid copyright registration for

6  its works."  Malibu Textiles, Inc. v. Label Lane Int'l, Inc., 922 F.3d 946, 951 (9th Cir. 2019).

7        One method of copyright ownership involves co-ownership.  Richlin v. MGM Pictures,

8  Inc., 531 F.3d 962, 968 (9th Cir. 2008).  A "joint work" is "a work prepared by two or more

9  authors with the intention that their contributions be merged into inseparable or interdependent

10  parts of a unitary whole."  17 U.S.C. § 101; Aalmuhammed v. Lee, 202 F.3d 1227, 1231 (9th Cir.

11  2000); Ashton-Tate Corp. v. Ross, 916 F.2d 516, 520 (9th Cir. 1990).  "The authors of a joint

12  work are co-owners of the copyright in that work."  17 U.S.C. § 201(a); Richlin, 531 F.3d at 968;

13  Ashton-Tate, 916 F.2d at 521.  Each author must make an "independently copyrightable

14  contribution," which is a contribution that "represents original expression that could stand on its

15  own as the subject matter of copyright."  Ashton-Tate, 916 F.2d at 521 (quoting P. Goldstein,

16  Copyright:  Principles, Law and Practice, § 4.2.1 p.379 (1989)); see also Richlin, 531 F.3d at 968.

17  That is, "to be an author, one must supply more than mere direction or ideas; one must 'translate

18  an idea into a fixed tangible expression entitled to copyright protection."  S.O.S., Inc. v. Payday,

19  Inc., 886 F.2d 1081, 1087 (9th Cir. 1989); Ashton-Tate, 916 F.2d at 521.  One co-owner may

20  bring suit to enforce a copyright without joining the other co-authors/co-owners to the suit.

21  Corbello v. Devito, 777 F.3d 1058, 1065 (9th Cir. 2015).  Because each co-owner of a "joint

22  work" has an independent right to use or license the copyright, a co-owner cannot be liable to

23  another co-owner for infringement of copyright, but co-owners must account to other co-authors

24  for any profits earned from licensing or using the copyright.  See id. at 1062, 1066; Ashton-Tate,

25  916 F.2d at 522; Oddo v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984).  Further, unless all co-

26  owners/co-authors of a "joint work" join in granting an exclusive license, a single co-author

27  (acting on its own behalf) can grant only a non-exclusive license in the copyright work because

28  one co-author cannot limit the other co-authors' independent right to exploit the copyright.

Sybersound, 517 F.3d at 1146.  However, a co-owner of a copyright is free to transfer his

ownership interest to another, as long as the transfer is only of the exclusive copyright interests

that the transferring co-owner himself possesses.  Tresona Multimedia, LLC v. Burbank High Sch.

Vocal Music Ass'n, 953 F.3d 638, 645 n.2 (9th Cir. 2020); see Corbello, 777 F.3d at 1065.  A co-

owner of a copyright can transfer its interests in the copyright without the permission of the other

co-owners.  Corbello, 777 F.3d at 1064-66 & n.5.

### *Discussion*

Both parties acknowledge that the Court previously dismissed any copyright infringement

claim by Morena that was based on Morena being a co-author/co-owner of the albums.  See

Yellowcake, Inc. v. Morena Music, Inc., 2021 U.S. Dist. LEXIS 39127, *21-*22 (E.D. Cal. Mar.

1, 2021).  The Court dismissed this theory because the allegations of the Counterclaim and

Yellowcake's Complaint indicated that, by virtue of the transfer agreement between Yellowcake

and Chavez, Morena was a co-owner with Yellowcake.  See id.  The Court dismissed Morena's

infringement claim with leave to amend and instructed Morena that any amendment was required

to explain why Yellowcake was not a co-owner with Morena.  See id. at *50.  In response to the

Court's order, Morena contends that it is relying on the theory that it is a co-owner with Chavez

and that Yellowcake is not a co-owner because the agreement between Chavez and Yellowcake is

void ab initio.  Specifically, after alleging that Morena "is at least a co-owner along with Chavez

in the copyrights for the Los Originales Albums," FAC ¶ 18, the FAC in alleges:  ". . . Chavez

purportedly entered into an agreement to ostensibly sell the entirety of all right, title, and interest

in and to the Los Originales Albums and Cover Art exclusively to . . . Yellowcake.  At the time he

entered into this agreement with . . . Yellowcake, however, Chavez did not possess such exclusive

rights to grant in their entirety, rendering such agreement void ab intio."  FAC ¶ 21.

A contract that is "void ab initio" is "[n]ull from the beginning," Black's Law Dictionary

(11th Ed. 2019), and treated as if it had never existed.  LA Sound USA, Inc. v. St. Paul Fire &

Marine Ins. Co., 156 Cal.App.4th 1259, 1266 (2007); see also Chen v. Bell-Smith, 768 F.Supp.2d

121, 134 (D. D.C. 2011).  If the transfer agreement between Chavez and Yellowcake is void ab

initio, then the transfer agreement transferred nothing between Chavez and Yellowcake.  See

1  Chen, 768 F.Supp.2d at 134; A-Mark Coin Co. v. General Mills, Inc., 148 Cal.App.3d 312, 322

2  (1983) ("No rights are enforceable under a void contract.").

3       Morena relies heavily on *Sybersound* to argue that it is a co-owner with Chavez and not

4  Yellowcake.  In *Sybersound*, plaintiff Sybersound attempted to enforce karaoke-use interests in

5  certain copyrights.  See Sybersound, 517 F.3 at 1141-42.  Sybersound claimed "to have acquired

6  an ownership interest in [several songs] by entering into a written agreement with TVT, an

7  original [co-owner] to the copyright of these songs."  Id. at 1142.  Sybersound argued that "it

8  stepped into TVT's shoes and became a co-owner in the karaoke-use interest of the copyright

9  when it became the 'exclusive assignee and licensee of [TVT's] copyrighted interests for purposes

10 of karaoke use, and also exclusive assignee of the right to sue to enforce the assigned copyright

11 interests . . . pursuant to the assignment agreement with TVT."  Id. at 1145.  The Ninth Circuit

12 found that Sybersound's position was flawed because TVT could not grant an exclusive right in

13 the karaoke interests of the copyrights.  See id.  The Ninth Circuit assumed that the karaoke-use

14 interest was an interest protected by copyright but observed that TVT was not the exclusive owner

15 of that interest.  See id.  "[U]nless all the other co-owners of the copyright joined in granting an

16 exclusive right to Sybersound, TVT, acting solely as a co-owner of the copyright, could grant only

17 a non-exclusive license to Sybersound because TVT may not limit the other co-owners'

18 independent right to exploit the copyright."  Id.  Additionally, the Ninth Circuit rejected the

19 argument that Sybersound became an exclusive assignee of TVT's copyright interests because the

20 assignment agreement transferred all its karaoke interests to Sybersound.  See id. at 1146.  The

21 Ninth Circuit held that, in order to be effective, an assignment or any other alienation permitted by

22 the Copyright Act must be exclusive, and because TVT's assignment was admittedly non-

23 exclusive, TVT succeeded only in transferring what it could – a non-exclusive license.  See id.  A

24 non-exclusive licensee cannot sue for copyright infringement.  See id.

25      In *Corbello*, the Ninth Circuit addressed the argument that *Sybersound* prohibited co-

26 owners from transferring their rights without the permission of other co-owners.  See Corbello,

27 777 F.3d at 1064.  In finding that *Sybersound* did not prohibit co-owners from transferring their

28 rights without permission from other co-owners, the *Corbello* court described and explained part

of *Sybersound* as follows:

> We held [in *Sybersound*] that when one co-owner independently attempts to grant an exclusive license of a particular copyright interest, that licensee—in this case, Sybersound—does not have standing to sue alleged third-party infringers. [*Sybersound*, 517 F.3d] at 1146. After all, one co-owner, acting independently, "may not limit the other co-owners' independent rights to exploit the copyright." Id. Such a conclusion stems from the self-evident principle that a joint-owner cannot transfer more than he himself holds; thus, an assignment or exclusive license from one joint-owner to a third party cannot bind the other joint-owners or limit their rights in the copyright without their consent. In other words, the third party's right is "exclusive" as to the assigning or licensing co-owner, but not as to the other co-owners and their assignees or licensees. As such, a third-party assignee or licensee lacks standing to challenge the attempted assignments or licenses of other copyright owners.
>
> . . . But [*Sybersound*'s] emphasis on the word "exclusive" in these provisions cannot mean that only sole owners possess "exclusive" rights, as such a rule would run directly contrary to another well-settled principle of copyright law: the right of one joint-owner to sue third-party infringers without joining any of his fellow co-owners, a right Sybersound itself expressly recognizes. See id. at 1145 . . . . After all, the copyright statute permits infringement suits only if brought by owners of an "exclusive right" against alleged violators of such "exclusive right." 17 U.S.C. § 501 (emphasis added). If an "exclusive right" could only be possessed by a sole owner of a copyright, a co-owner would be unable to bring an infringement action to protect his interest.
>
> Moreover, such a limitation would contradict the principle of the free transferability of copyright ownership interests—a principle reflected in both the express language of § 201(d) and our Circuit precedent, neither of which treat transferability differently based on whether the original copyright owner is a sole owner or a co-owner. See, e.g., Silvers, 402 F.3d at 887; Gardner, 279 F.3d at 779; Bagdadi, 84 F.3d at 1197. Thus, *Sybersound* merely imposes a standing limitation on copyright assignees and licensees that reflects the basic principle that one cannot give away more than one's share in a copyright—it need not, and should not, be extended to limit a co-owner's ability to transfer unilaterally any exclusive copyright interests that he himself possesses.

Id. at 1065-66.  The *Corbello* transfer was not affected by *Sybersound* and "constituted a transfer of DeVito's derivative-work interest in the copyright, rather than a license."  Id. at 1066.  Thus, the plaintiff could bring an infringement claim as an owner of a copyright interest.  Id. at 1064-66.

Part of the analysis from *Corbello* was quoted with approval in *Tresona*.  See Tresona, 953 F.3d at 645.  *Tresona* further emphasized that the transfer in *Corbello* was a transfer of an interest and not a mere non-exclusive license.  See id. at 645 n.2.  "[A] co-owner of a copyright is free to transfer that ownership interest to another, as long as the transfer was only of 'exclusive copyright interests that [the co-owner itself] possess.'"  Id. (quoting Corbello, 777 F.3d at 1066.

9

In this case, Yellowcake's Complaint alleges that it is the exclusive owner of the copyrights to the albums; documents from the Copyright Office indicate that Yellowcake is the sole claimant by virtue of a written transfer contract to the albums/copyrights; and the FAC alleges that Chavez and Yellowcake entered into an agreement for the sale of all rights, titles, and interests in the albums.  See Doc. No. 1 & Ex. A; FAC ¶ 21.  The allegation of the FAC combined with the actual copyright documents submitted by Yellowcake indicate that Chavez was not attempting to assign an exclusive license or carve out an exclusive interest as in *Sybersound*.  Instead, the FAC when read in light of the copyright documents indicate that Chavez was selling everything, including all of his own rights in the albums, to Yellowcake.  There is no indication or allegation that Chavez reserved any kind of ownership interest in the copyrights or divided any of the interests.  Chavez could sell all interests that he possessed as a co-owner in the albums, and the consent of Morena was not required.  See Corbello, 777 F.3d at 1064-66 & n.5.

Of course, *Sybersound*, *Corbello*, and *Tresona* indicate that Chavez could not have sold the totality of all the exclusive rights in the albums/copyrights because Morena as a co-owner did not consent.  However, the Court cannot conclude that simply because all existing exclusive rights in the jointly-owned copyrights/albums could not have been transferred is enough to render the agreement between Chavez and Yellowcake void ab initio.

First, Morena cites no authority that the agreement between Chavez and Yellowcake is void ab initio.  Second, even in *Sybersound*, the Ninth Circuit read the transfer agreement as effecting the creation of a non-exclusive license because TVT could not grant the exclusive rights or license at issue.  See Sybersound, 517 F.3d at 1146.  *Sybersound* did not hold that the assignment was void ab initio.  Third, *Corbello* and *Tresona* examined *Sybersound* and concluded that agreements which unsuccessfully attempt to transfer exclusive rights that a transferor does not have are still effective as between the transferor and the transferee.  See Tresona, 953 F.3d at 645; Corbello, 777 F.3d at 1065.  The key is that a transfer is limited by the rights possessed by the transferor and the rights that are attempted to be transferred.  See Tresona, 953 F.3d at 645 n.2; Corbello, 777 F.3d at 1064-66.  One cannot convey what one does not possess.  In this case, Chavez (per the FAC's allegations) had a full co-ownership interest in the albums that he could

1 transfer without the consent of Morena.  See Corbello, 777 F.3d at 1064-66 & n.5; see also

2 Tresona, 953 F.3d at 645 & n.2.

3        In sum, because the allegations and judicially noticed documents indicate that Chavez

4 attempted to convey all rights he possessed in the copyrights, even if he misunderstood the extent

5 of the rights he possessed, the circumstances at this time appear to be more in-line with *Corbello*

6 than *Sybersound*, meaning that a transfer of all of Chavez's rights in the copyrights was

7 accomplished.  Thus, the allegations and judicially noticed documents do not plausibly indicate

8 that Morena is a co-owner with Chavez and not Yellowcake.  The end result is that Chavez has no

9 more exclusive rights in the copyrights, is no longer an owner of the copyrights, and that

10 (crediting Morena's allegations in this Rule 12(b)(6) motion) Morena and Yellowcake are co-

11 owners of the copyrights.  Since co-owners cannot be liable to each other for copyright

12 infringement, see id. at 1066; Ashton-Tate, 916 F.2d at 522; Oddo, 743 F.2d at 632-33, dismissal

13 of the first cause of action is appropriate.

14        This is the second time that the Court has dismissed the co-owner theory of copyright

15 infringement because the allegations and judicially noticeable documents indicated that Morena

16 and Yellowcake were co-owners.  Therefore, dismissal will be without leave to amend at this time.

17 However, the Court recognizes that no scheduling order has been entered and no discovery or

18 amendment deadlines set.  It is possible that further discovery could alter the Court's analysis.  If

19 Morena diligently obtains evidence that indicates that Yellowcake is not a co-owner of the

20 copyrights, Morena may file a motion for reconsideration or file a timely amended counterclaim in

21 accordance with any deadlines set by a scheduling order.  Finally, because co-owners are required

22 to account to each other for their use of a co-owned copyrights, the Court will permit Morena to

23 file an amended counterclaim that includes a claim for an accounting against Yellowcake.  See

24 Corbello, 777 F.3d at 1062; Ashton-Tate, 916 F.2d at 522; Oddo, 743 F.2d at 632-33.

25

26 **II.**      **Third Cause of Action – UCL**

27          *Counter-Defendant's Argument*

28          YCH argues that the FAC's UCL claim is conclusory, lacks factual support, and

improperly lumps all Counter-Defendants together without describing what each defendant did. As best can be gleaned from the allegations, it appears that Morena is alleging a UCL claim due to alleged infringing conduct.  However, the Court already determined that such a claim is preempted by the Copyright Act.  Therefore, no claim is plausibly alleged.

### Counter-Plaintiff's Opposition

Morena argues that its UCL claim is not preempted by the Copyright Act because its claim is premised on all of YCH's wrongful conduct, including Hernandez intentionally and willfully misleading Chavez into granting Yellowcake rights in the albums that he did not possess.  The conduct that is incorporated by reference is "unfair" because YCH's conduct of misleading Chavez into mistakenly believing that Morena had no rights to the albums/copyrights was an act that threatened or harmed competition and that was immoral and unethical.

### Legal Standard

The UCL broadly proscribes the use of any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200; Beaver v. Tarsadia Hotels, 816 F.3d 1170, 1177 (9th Cir. 2016). "The UCL operates as a three-pronged statute:  'Each of these three adjectives [unlawful, unfair, or fraudulent] captures a 'separate and distinct theory of liability.'"  Beaver, 816 F.3d at 1177 (citation omitted).  The UCL's "unlawful" prong "borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL," and "virtually any law or regulation — federal or state, statutory or common law — can serve as a predicate . . . ." Candelore v. Tinder, Inc., 19 Cal.App.5th 1138, 1155 (2018).  When the underlying legal claim that supports a UCL cause fails, however, "so too will the [the] derivative UCL claim."  AMN Healthcare, Inc. v. Aya Healthcare Services, Inc., 28 Cal.App.5th 923, 950 (2018).  California law with respect to "unfair" conduct is currently "in flux."  Hodsdon v. Mars, Inc., 891 F.3d 857, 866 (9th Cir. 2018).  Conduct is "unfair" either when it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition," or when it 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  Id.

*Discussion*

The third counterclaim incorporates by reference all prior paragraphs, states that YCH's conduct including acts of infringement harmed Morena and the public, and notes that a UCL claim can be based on the violation of any state or federal law.  See FAC ¶¶ 54-56.

The most natural reading of the third cause of action is that Morena's UCL claim is based on infringement of Morena's copyrights in the albums and cover art by YCH; no other basis is clearly apparent.  However, the Court already held that such a UCL claim based on infringement is preempted by the Copyright Act.  See Yellowcake, at *43-*44.  Morena does not address the Court's prior analysis, nor does it vigorously defend any UCL claim based on infringing conduct by YCH.  The Court detects no reason to deviate from its prior conclusion.  Therefore, any UCL claim based on infringing conduct is preempted.  See id.

Morena's opposition argues that it has incorporated by reference other paragraphs and thus, the entirety of YCH's conduct is at issue.  In particular, however, Morena's opposition focuses on Hernandez intentionally and willfully misleading Chavez into the mistaken belief that Morena had no rights in the albums and thus, that he could freely sell all rights in the albums to YCH.  There are problems with this theory.[1]

First, Paragraph 53 of the FAC, which is the first paragraph of the third cause of action, incorporates by reference all prior paragraphs.  As part of the incorporation by reference, irrelevant paragraphs are included.  This pleading practice – incorporating all prior paragraphs by reference irrespective of relevance to the claim being pled – is an improper shotgun pleading technique that generally does not give sufficient notice of the actual basis for a claim.  See Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1321-23 (11th Cir. 2015); Deerpoint Grp., Inc. v. Agrigenix, LLC, 345 F.Supp.3d 1207, 1234 n.14 (E.D. Cal. 2018).  The Court held that Morena's prior Counterclaim used improper shotgun pleading and explained that the practice should be avoided.  See Yellowcake, 2021 U.S. Dist. LEXIS 39127 at *34-*35 & n.4.

[1] There are three bases for a UCL claim, "unlawful," "fraudulent," and "unfair" conduct.  Beaver, 816 F.3d at 1177.  Morena presumably knows exactly what conduct of YCH violates which aspects of the UCL.  It is up to Morena to clearly explain its theories of liability.  It is not enough for Morena to say that the entirety of YCH's conduct is at issue and then identify only one act by Hernandez.  Since Morena has only identified one act by Hernandez, the Court will only focus on Hernandez's misleading acts/misrepresentations in obtaining Chavez's copyright interests.

Morena did not heed the Court's prior analysis.  The basis identified from the opposition for Morena's UCL claim is not clear or obvious from the other prior paragraphs.  Morena's second use of the shotgun pleading technique once again fails to apprise the Court and opposing counsel of the basis for its UCL claim.  See id.  On this basis alone, dismissal of the third counterclaim is appropriate.

Second, even if the Court held that the FAC gives fair notice of a UCL claim based on Hernandez's conduct in obtaining Chavez's ownership interests in the albums, Morena has not adequately alleged that any "unfair" conduct caused it harm.  Chavez was at least a co-owner of the albums.  As a co-owner, Chavez had the ability to transfer the entirety of his own interests in the albums without the permission of co-owner Morena.  See Corbello, 777 F.3d at 1064-66 & n.5. Morena has no recognizable interest in or claim to Chavez's ownership rights that would allow it to veto or limit a full transfer by Chavez.  Thus, Hernandez could attempt to obtain or actually obtain the totality of Chavez's ownership interest in the copyrights, irrespective of Morena's interests or consent.  While Morena alleges that Hernandez made misrepresentations in obtaining Chavez's ownership interests, the misrepresentations do not appear to be germane.  Even if Chavez believed the misrepresentations that Morena had no ownership interest in the copyrights, Chavez still would have correctly believed that he was transferring all ownership interests that he possessed through the transfer agreement.  Even considering the alleged true extent of Chavez's ownership interests in the copyrights, Chavez could still sell his actual  interest without regard to Morena.  Further, the misrepresentations were directed solely to Chavez in order to convince him to sell.  It would therefore seem that the person who would be injured from Hernandez's misrepresentations is Chavez, not Morena.[2]  There is no indication that Hernandez made misrepresentations to Morena or that Morena detrimentally relied on the misrepresentations in any way.  While the Court would agree that Yellowcake's conduct after acquiring Chavez's interests and registering the copyrights was detrimental to Morena, that conduct is separate from and post-

---

[2] The Court notes that any injury to Chavez would appear to be theoretical at best.  By believing Hernandez, Chavez may have actually obtained a windful because Yellowcake allegedly was attempting to pay for all rights that existed in the copyrights, not just Chavez's.  Presumably one would pay more to be a sole-owner of a copyright, as opposed to a joint-owner.  Thus, it seems unlikely that Chavez has suffered any injury from the conduct of YCH.

dates any misrepresentations from Hernandez to Chavez.  Therefore, it is unclear how misrepresentations to Chavez about the extent of his or Morena's ownership interests in the albums are either "unfair" or injurious to Morena.

In sum, there is no plausible claim alleged for a violation of the UCL.[3]  The UCL theory that is clearly alleged in the FAC is preempted and the theory that is identified in the opposition is neither fairly noticed nor plausibly pled in the FAC.  This is the second time that the Court has dismissed Morena's UCL claim.  The only theories of UCL liability that have been adequately identified are not plausible.  Thus, the Court will dismiss the UCL claim without leave to amend.[4]

## III.   **Rule 11 Sanctions**

Rule 11(c)(2) "provides strict procedural requirements for parties to follow when they move for sanctions under Rule 11."  Radcliffe v. Rainbow Const. Co., 254 F.3d 772, 788 (9th Cir. 2001); see Hadsell v. Baskin, 790 Fed. App'x 97, 98 (9th Cir. 2020).  Among other things, a "motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)."  Fed. R. Civ. P. 11(c)(2).

In this case, YCH requests Rule 11 sanctions as part of its Rule 12(b)(6) motion.  YCH's request therefore violates the "separate motion" requirement.  Because YCH has failed to meet the "strict procedural requirements" of Rule 11(c)(2), YCH's motion for Rule 11 sanctions will be denied.  See id.; Cohen v. American Sec. Ins. Co., 735 F.3d 601, 607 n.3 (7th Cir. 2013); Williamson v. Recovery L.P., 542 F.3d 43, 51-52 (2d Cir. 2008); Beltran v. Procare Pharm., LLC, 2020 U.S. Dist. LEXIS 194043, *9 (C.D. Cal. Oct. 19, 2020); South Shore Ranches, LLC v. Lakelands Co., LLC, 2009 U.S. Dist. LEXIS 42941, *21 (E.D. Cal. May 13, 2009).

---

[3] The Court also agrees with YCH that the complaint improperly lumps all Defendants together under the third cause of action without adequately differentiating which defendant committed which wrongful acts, or how each Defendant may be liable for the acts of another Defendants.  See FAC ¶¶ 53-57.  The third cause of action therefore violates the general rule that broad allegations that lump multiple defendants together without distinguishing the alleged wrongs or actions between the defendants fail to provide individual defendants with adequate notice.  See Warnshuis v. Bausch Health U.S., LLC, 2020 U.S. Dist. LEXIS 107136, *23 (E.D. Cal. June 18, 2020) (and cases cited therein).

[4] Again, Morena indicated that the entirety of YCH's conduct is at issue for purposes of its UCL claim.  If Morena can identify specific conduct by Yellowcake, Colonize, or Hernandez that is actionable under the UCL, then Morena can file a motion for reconsideration of the decision to dismiss the third cause of action without leave to amend.

**<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED that:

1. Counter-Defendants' Rule 12(b)(6) motion to dismiss (Doc. No. 41) is GRANTED;

2. The first and third counterclaims are DISMISSED without leave to amend;

3. Within fourteen (14) days of service of this order, Counter-Plaintiff may file a Second Amended Counterclaim that adds a claim for an accounting;

4. If Counter-Plaintiff fails to timely file a Second Amended Complaint, then Defendants shall file an answer to the First Amended Counterclaim within twenty-one (21) days of service of this order; and

5. Counter-Defendants' motion for Rule 11 sanctions is DENIED.


IT IS SO ORDERED.

Dated:   August 2, 2021                          _____

                                                              SENIOR  DISTRICT  JUDGE